**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| **KAYLA PENDER,** *individually and on* | : | |
| *behalf of all others similarly situated,* | : | |
| | : | |
| **Plaintiffs,** | : | |
| | : | **Case No: 2:21-cv-04292** |
| **v.** | : | |
| | : | **Judge Algenon L. Marbley** |
| **FLYING S. WINGS, INC.** *et al.,* | : | **Magistrate Judge Kimberly A. Jolson** |
| *d/b/a* **Buffalo Wild Wings,** | : | |
| | : | |
| **Defendants.** | : | |

## OPINION AND ORDER

This matter is before this Court on Defendants' Motion For Summary Judgment (ECF No. 107) and Plaintiffs' Motion for Partial Summary Judgment (ECF No. 108). For the reasons set forth below, the Defendants' motion (ECF No. 107) is **GRANTED IN PART AND DENIED IN PART** and Plaintiffs' motion (ECF No. 108) is **GRANTED IN PART AND DENIED IN PART**.

## I.      BACKGROUND

This case arises from the payment of servers and bartenders who are tipped employees at four restaurants doing business as Buffalo Wild Wings in Ohio and West Virginia. (ECF No. 42 ¶¶ 21–23). Plaintiff Kayla Pender, on behalf of herself and others similarly situated, brought this collective action against Defendants Flying S. Wings, Inc.; Flying Buffalo Inc.; Chase & Green Corp.; Scott Lloyd; and Stephon Green. ("Defendants"). (ECF No. 42). Defendants Flying S. Wings, Inc., Flying Buffalo, Inc., and Chase and Green Corp. own the four restaurants. (*Id*.). Defendants Scott Lloyd and Stephon Green are owners and operators and, according to the complaint, Lloyd and Green "mak[e] operational and strategic decisions affecting employees, including decisions affecting the terms and conditions of the individuals employed to work for the

1

entity-Defendants at their Buffalo Wild Wings franchises in Ohio and West Virginia." (*Id*. ¶¶ 24–25). While the four restaurants are operated independently, the Defendants have hired two individuals with responsibilities at each restaurant: Chris Beltran, the Regional Manager; and Ben Omaits, the Training Manager. (ECF No. 106-1 ¶ 3).

Plaintiffs' claims are based on minimum wage laws. Namely, laws permitting employers of "tipped employees"[1] to take a "tip credit."[2] Under these laws, employers are allowed to pay tipped employees a "tip wage" of less than the minimum wage when the tipped employees' tips make up the difference between the tip wage and the minimum wage. Plaintiff alleges that Defendants' pay of tipped employees violated the Fair Labor Standards Act, 29 U.S.C. § 201, et seq, as amended ("FLSA"), Article II, Section 34A of the Ohio Constitution, and the Ohio Minimum Fair Wage Standards Act, O.R.C. §§ 4111.01, 4111.02, 4111.08, 4111.09, 4111.10, 4111.13, and 4111.99 ("the Ohio Wage Act" or "OWA").

## A. Employee Work

From October 2019 until June 15, 2021, Kayla Pender was employed by Defendants at the Buffalo Wild Wings restaurant located at 50725 Ohio Valley Place Access Road, Saint Clairsville, Ohio 43950. (ECF No. 42 ¶ 46). During her employment, Defendants compensated her with a subminimum hourly wage, supplemented by customer tips. (*Id*.). Defendants similarly employed other individuals as servers and bartenders at their Buffalo Wild Wings locations in Ohio and West Virginia. (*Id*. ¶ 48). In doing so, Defendants relied on customer gratuities to bridge the gap between the subminimum wage paid and the applicable minimum wage. (*Id*. ¶ 50).

---

[1] The Fair Labor Standards Act defines "tipped employee" as "any employee engaged in an occupation in which he customarily and regularly receives more than $30 a month in tips."

[2] Exception to the minimum wage rate allowing an employer to "pay tipped employees as low as $2.13 an hour, but, if the employee's tips fail to bring the employee's overall wage to at least $7.25 per hour, the employer must supplement the tipped employee's wages to equal the minimum wage." *Popp v. Brewdog Brewing Co., LLC*, No. 2:24-CV-338, 2025 WL 345980, at *2 (S.D. Ohio Jan. 30, 2025).

Pender, along with other servers and bartenders, recorded their working hours using the restaurant's Point of Sale ("POS") system. (ECF Nos. 106-1 ¶ 9; 106-5 at 64-65, 106-11 at 37). The POS system allowed employees to clock in under different job classifications, including "bartender," "cashier," "meeting," and "server." (ECF Nos. 106-1 ¶ 9; 106-5 at 64; 106-11 at 37-38; 106-12 at 38-39). Generally, employees understood that if they arrived before opening, they were expected to clock in under the "meeting" code. (ECF Nos. 106-9 at 49; 106-11 at 60; 106-13 at 32). Some tipped employees were trained or otherwise knew that they were to clock in under "meeting," and clock out of meeting and into "server" once they began serving tables. (ECF No. 106-13 at 20; 106-5 at 36; 106-7 at 111). Employees would also clock out of server and into meeting for side work and at the end of the shift. (ECF No. 106-5 at 64; 106-7 at 106).

Not all employees had a consistent experience in instructions to clock in and out. Some report that the "meeting" option was not always available, that they were told to not use the meeting code, or  that they were otherwise discouraged from using the meeting code. (ECF Nos. 106-4 at 38; 106-6 at 77). Others did not recall receiving any training during orientation about clocking in under meeting or  transitioning in and out of the "server" classification. (ECF Nos. 106-9 at 89; 106-11 at 38).

 Employees often performed multiple duties during their shifts. For example, those hired as a server were, at times, performing the duties of cashier, dishwasher, or a greeter. (ECF Nos. 107-2 at 697-698; 107-1 at 12; 106-5 at 161). There are also reports of servers filling the role as an "expo." An "expo" works at the counter separating the kitchen from the server area, is responsible for getting the cooked food onto a serving tray, gathers the appropriate condiments for the order, and takes the serving tray to the table or makes the tray available for the server to take to the appropriate table. (ECF Nos. 107-1 at 11-12; 106-2 at 87-88; 106-5 st 162).

3

Notably, not all job classifications were consistently accessible within the POS system at all times. (ECF No. 107-2 at 698). Several employees reported that they lacked the necessary authorization to select certain roles within the system. (ECF Nos. 107-2 at 127, 795; 106-12 at 39). This limitation is significant because the POS system was configured with distinct job classifications, each associated with a different rate of pay. (ECF No. 106-1 ⁋ 9; 106-9 at 37). For instance, when an employee selected the "cashier" classification, they were compensated at the full minimum wage rate. (ECF Nos. 106-5 at 174; 106-6 at 25). By contrast, classifications such as "server," "bar server," and "bartender" were associated with a tipped wage rate. (ECF No. 106-2 at 47). Selecting the "meeting" classification resulted in compensation at the full minimum wage rate. (ECF Nos. 106-5 at 86-87, 188-189).

## B. Tipped Employees' Duties

Tipped employees performed various types of work that the parties call "side work." This includes opening work, shift change work, "outs" work, and closing work. (ECF Nos. 107-1 at 19; 106-6 at 103).

First, opening work involved preparing the restaurant and was paid at a full minimum wage. (ECF No. 42 . ⁋ 64). Defendants implemented the "Server Opening Duties (Main Dining)" checklist, (ECF No. 109-1) and the BWW Learning Hub-Opening Shift (Dining Room) policy (ECF No. 109-2). Based on these policies, a server's "opening" duties included:

- Clean and sanitize all tables tops, chairs, booth, including table and chair and legs
- Spot sweep dining rooms if needed
- Fill all ice bins at server stations
- Set up soap and sanitizer buckets
- Brew iced tea
- Cut lemons and day dot
- Set up dirty silverware bins
- Daily cleaning
- Sweep parking lot and pick up cigarette butts
- Set up soda station and stock paper products

4

When servers changed shifts, there were specific tasks to be completed as the server finishes a shift while the restaurant is still open. These duties included:

- Clean and sanitize all tables tops, chairs, booths
- Clean and restock table caddies
- Roll all flatware
- Make sure dishes and cups washed and put away
- Wipe down counter tops and cabinet doors
- Clean and restock all soda and server stations
- Fill all ice bins
- Make sure fresh iced tea at all station
- Sweep
- Empty all trash

(ECF No. 110-7). A tipped employee reported that, if all the tasks were done at shift change, it would take around three hours and fifty minutes. (ECF No. 107-2 at 514). Servers often completed this work under their server code. (ECF No. 107-2 at 40, 627) and the tasks were often shared as everyone "did a little bit of everything." (ECF No. 107-2 at 514).

There was also an "outs-main dining" policy. "Outs" work, essentially shift change work, is done when a server station is closed. (ECF Nos. 106-5 at 151-52; 109-9 at 122). Some servers were trained to use the meeting code for the outs work but would sometimes complete the tasks while under the server code. (ECF Nos. 106-5 at 119-20, 126, 158, 178; 106-4 at 53-54; 106-13 at 32, 38). The tasks include:

- Clean garbage can in station
- check dumpster area
- sweep floor and make sure trash is in dumpsters
- Clean out sink by dishwasher
- clean out tea urns, wipe cupboard doors in server station
- fill dry stock in server station
- Take back lemon container and clean
- Clean drain
- wipe down black walls in server station
- bring out tumblers
- take back lemon
- Clean and tear pop machine

- empty and spray down blue dustpan
- run any leftover trash
- if garage is closed, spray off cup rack and trash lid
- Take drain apart and set parts above dishwasher

(ECF Nos. 110-6; 109-9 at 77-78).

Finally, at closing, severs completed work much like the outs work. It was either divvied up and the closing server assigns the closing work to the servers who are leaving before closing, but sometimes the closing server finishes the tasks. (ECF Nos. 106-5 at 137, 155; 106-13 at 49).

Closing servers had to:

- Do daily cleaning
- Clean and sanitize all tables tops, chairs, booth, including table and chair and legs
- Clean and restock all tables caddies
- Make sure all dishes and cups are washed and put away
- Wipe down counter tops and cabinet doors
- Clean and restock all soda and server stations with necessary paper products
- Clean pop machine and nozzles
- Wash lemon container
- Sweep and mop server stations in dining room
- Sweep and vacuum dining room
-  Wash left over trays
- Empty all trash cans and place fresh liner; remove all trash from building to dumpster
- Empty all soap and sanitizer buckets, wash and sanitize all tables tops, chairs, booths

(ECF Nos. 109-4; 106-5 at 122-25; 109-9 at 71). Defendants assert that the cleaning aspects of this work were to be completed under the meeting code. That said, Pender admits to completing the work while still clocked in at the tipped rate. (ECF No. 106-5 at 119-20, 138, 196, 203).

## C.  Tip Credit

Some Plaintiffs reported receiving training on the tip credit when they transitioned into roles as servers or bartenders. (ECF Nos. 106-4 at 26-27; 106-9 at 41-42). Managers, however, testified that they did not recall any formal policy requiring employees to be informed of anything beyond their hourly wage. (ECF Nos. 109-9 at 150-51). Some Plaintiffs acknowledged  being

6

informed of their rates of pay when they interviewed or upon promotion into a tipped position. (ECF Nos. 106-9 at 25-27, 41-42; 106-7 at 42-44, 46-47). Others, specifically Pender, denied knowing what the rate of pay was before she accepted the job. (ECF No. 106-5 at 34-35)

In November 2021, Defendants began using a tip credit notification form and several Plaintiffs admit receiving the form. (ECF Nos. 106-2 at 21-22; 106-11 at 52, 106-12 at 100-01). The form stated that the employer intended to use the tip credit and explained: (1) the employee's amount of cash wage; (2) the amount claimed as tip credit; (3) that the tip credit cannot exceed the amount of tips received; (4) that all tips are to be retained by the tipped employee except through tip pooling arrangements; and (5) that the tip credit will not apply unless the employee was informed of the tips. (ECF Nos. 106-12 at Ex. 64; 106-2 at Ex. 21).

Additionally, some Plaintiffs admit to seeing posters with tip credit information in the restaurants on the employee bulletin boards (ECF No. 106-4 at 27-28), while others deny ever seeing a poster (ECF Nos. 106-9 at 46; 106-6 at 37; 106-8 at 99; 110-4 at 33; 110-8 at 36). Defendants, however, assert that the large posters were changed each year the minimum wage rates were changed. (ECF Nos. 106-1 ¶13). In the center of the Ohio poster was a section entitled "MINIMUM WAGE" preceded by the year and it included "TIPPED EMPLOYEES" stating "A minimum Wage of $4.35 per hour PLUS TIPS." (ECF No. 106-5 at 102-05, Ex.2 p.2). It included the following:

> "Tipped Employees" includes any employee who engages in an occupation in which he/she commonly and regularly receives more than thirty dollars ($30.00) per month in tips. Employers electing to use the tip credit provision must be able to show that tipped employees receive at least the minimum wage when direct or cash wages and the tip credit amounts are combined.

(*Id*.). Defendants also described a West Virginia poster stating, "EMPLOYEE RIGHTS UNDER THE FAIR LABOR STANDARDS ACT" and in a section entitled "TIP CREDIT," it provided:

> Employers of "tipped employees" who meet certain conditions may claim a partial wage credit based on tips received by their employees. Employers must pay tipped employees a cash wage of at least $2.13 per hour if they claim a tip credit against their minimum wage obligation. If an employee's tips combined with the employer's cash wage of at least $2.13 per hour do not equal the minimum hourly wage, the employer must make up the difference.

(ECF Nos 106-1 ¶13, ECF No. 116-1 at 131).

Pender and all of the opt-in Plaintiffs admitted that they received more than $30 per month in tips and none of them could identify any time when they received less than the minimum wage during a pay period. (*E.g.* ECF Nos. 106-9 at 95; 106-5 at 191-92).

### D.  Expenses

Servers and bartenders were issued two (and in some cases, one) uniform shirts, an apron, and server books, without cost, but employees were allowed to purchase more shirts if they chose to do so, and if so, they kept them when they stopped working for Defendants. (ECF Nos. 106-5 at 50, 73; 106-8 at 29; 106-13 at 26-27). Servers were also required to wear dark pants and non-slip shoes, which the restaurant did not provide and which the employees could wear off the job. (*E.g.* ECF Nos. 106-5 at 51-52; 106-8 at 23-24). Defendants provided server books and pens (ECF No. 106-5 at 54-56), but some servers chose to purchase their own server books. (E.g. *Id.* at 56; ECF Nos.  106-13 at 28; 106-6 at 32).

### E.  Procedural History

Plaintiff filed her Complaint on August 31, 2021, alleging violations of the FLSA, 29 U.S.C. § 201, et seq., as amended, Article II, Section 34A of the Ohio Constitution, and the Ohio Minimum Fair Wage Standards Act, O.R.C. §§ 4111.01, 4111.02, 4111.08, 4111.09, 4111.10, 4111.13, and 4111.99. (ECF No. 1). She asserted her claims as a class action on behalf of herself

and others similarly situated as tipped employees of Defendants. (*Id.*). She subsequently filed a First Amended Complaint on November 4, 2021. (ECF No. 10). Shortly thereafter, parties were referred to mediation. (ECF No. 13). The parties then entered into a Tolling Agreement providing that Plaintiff's and the putative collective members' claims would be tolled from November 11, 2021, through the date of mediation scheduled for February 17, 2022. (ECF No. 24-10 at 1). Provided mediation failed, the claims would be tolled through the date Plaintiff moved for conditional certification and court-authorized notice. (*Id*. at 1–2). On February 17, 2022, this Court received notice that the case was at an impasse. (ECF No. 17).

On April 19, 2022, Plaintiff requested leave to file a Second Amended Complaint (ECF No. 23) and moved for conditional certification of an FLSA collective of similarly situated employees under 29 U.S.C. § 216(b). (ECF No. 24). On June 15, 2022, the Second Amended Complaint was filed, again asserting as a collective action that Defendants violated the FLSA, the Ohio Constitution, and the Ohio Minimum Fair Wage Standards Act. (ECF No. 42).

The Second Amended Complaint is now the operative complaint and asserts two counts. In Count I, Plaintiff alleges that Defendants failed to pay Plaintiff and the FLSA collective members at the full minimum wage rate in violation of the FLSA's minimum wage requirement under 29 U.S.C. § 206. (ECF No. 42 ¶ 88). She further alleges that she and the FLSA collective members were required to incur expenses and pay for various tools and business-related costs, which constitute unlawful 'kick-backs' in violation of 29 U.S.C. § 203(m). (ECF No. 42 ¶ 95). Count II alleges that Defendants violated, and continue to violate, the Ohio Wage Act by failing to pay Plaintiff and the Ohio Wage Act collective members the full minimum wage in accordance with the Act. (ECF No. 42 ¶ 100).

On March 13, 2023, this Court granted Plaintiff's motion for conditional certification, defining the putative FLSA collective members as the following:

> [A]ll individuals who worked as servers at any one or more of Defendants' Buffalo Wild Wings restaurants in Ohio and West Virginia at any time during the three (3) year period preceding the filing of this lawsuit and were paid a direct cash wage of less than the federal minimum wage.

(ECF No. 51 at 2). The putative OWA collective members are:

> [A]ll servers and bartenders who worked at any one or more of Defendants' Buffalo Wild Wings restaurants located in Ohio at any time during the three (3) year period preceding the filing of this lawsuit and were paid a direct cash wage of less than the Ohio minimum wage set for that year.

(*Id*.). This Court noted that "[i]f discovery reveals that the class should be limited to a subset of the employees who work only at the same location that employed Plaintiff, the Court may address that issue on Defendants' motion to decertify the collective action at that time." (*Id*. at 13).

On November 11, 2024, Defendants filed a Motion for Leave to File Excess Pages (ECF No. 104) and a Motion to Dismiss Opt-in Plaintiffs who failed to participate in discovery. (ECF No. 103). On November 18, 2024, Defendants filed the Motion for Summary Judgment and Decertification of Collective Action (ECF Nos. 105; 107), and Plaintiffs filed a Motion for Partial Summary Judgment. (ECF No. 108).

## II.    LAW AND ANALYSIS

### A.  Motions for Summary Judgment[3]

#### 1.  Standard for Summary Judgment

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Berryman v.*

---

[3] The parties move for summary judgment by Defendants, and partial summary judgment by Plaintiffs on the same issues. This court will analyze the parties' arguments on each discrete issue hereinafter.

*SuperValu Holdings, Inc.*, 669 F.3d 714, 716–17 (6th Cir. 2012). The Court's role is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* at 249. Evidence that is "merely colorable" or "not significantly probative" will not defeat summary judgment. *Id.* at 249–50.

The party seeking summary judgment has the initial burden of presenting the Court with law and argument in support of its motion, as well as "identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)). "If the moving party satisfies its burden, then the burden of going forward shifts to the nonmoving party to produce evidence that results in a conflict of material fact to be resolved by a jury." *Cox v. Ky. Dep't of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995).

In considering the factual allegations and evidence presented in a motion for summary judgment, the Court "views factual evidence in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor." *Barrett v. Whirlpool Corp.*, 556 F.3d 502, 511 (6th Cir. 2009). Even so, "[t]he mere existence of a scintilla of evidence to support [the nonmovant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmovant]." *Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir. 1995); *see also Anderson*, 477 U.S. at 251.

Defendants seek summary judgment as to Counts I and II of the Second Amended Complaint. (ECF No. 107-1). They contend that Plaintiffs' wage claims lack merit because

11

Defendants may claim a tip credit. In support, they argue that they provided sufficient notice under the FLSA and OWA, and that the performance of non-tipped work or alleged charges or expenses do not invalidate the tip credit. (ECF No. 107 ¶¶ 2-6) Conversely, Plaintiff seeks partial summary judgment on the grounds that Defendants violated the federal minimum wage requirements by failing to provide employees with proper tip credit notice, as required under the FLSA; and by compensating employees at a tipped rate for non-tipped duties that were unrelated to their tipped work, rather than paying the applicable minimum wage. (ECF No. 108-1 at 3).

To the extent this Court declines to grant summary judgment on the entire Complaint, Defendants request summary judgment on any claims against Green and Lloyd, arguing that neither individual is an "employer" within the meaning of the FLSA, and there are no facts supporting individual liability against them. (ECF No. 107 ¶ 7).

Because this dispute relates to the Defendants' entitlement to take a tip credit, the Defendants bear the burden of proof. *See Myers v. Copper Cellar Corp.*, 192 F.3d 546, 549 n.4 (6th Cir. 1999) ("[A]n employer who invokes a statutory exemption from minimum wage liability bears the burden of proving its qualification for that exemption.")

### 2. *Minimum Wage and Tip Credit Notice*

Plaintiffs allege that Defendants failed to comply with the tip credit requirements under the FLSA, *inter alia*, by failing to inform Plaintiffs of the tip credit provisions as required by section 203(m) of the FLSA. (ECF No. 42 ¶¶ 10, 91). Both parties move for summary judgment on this claim, disputing the scope of the notice obligations imposed by section 203(m) and whether Defendants provided Plaintiffs with notice of the tip credit in accordance with relevant law. (ECF Nos. 107-1 at 18-22; 108-1 at 13-17).

Generally, FLSA mandates that employers compensate employees no less than the federal minimum wage. *See* 29 U.S.C. § 206(a). For tipped employees, however, employers may claim a tip credit against payment of the full minimum wage, using a portion of an employee's tips to satisfy the employer's minimum wage obligations to the employee. *See* § 203(m); *Kilgore v. Outback Steakhouse of Fla., Inc.*, 160 F.3d 294, 298 (6th Cir. 1998); *Crowell v. M St. Ent., LLC*, 670 F. Supp. 3d 563, 581 (M.D. Tenn. 2023).

In order to claim the tip credit and pay employees the tip wage, the employer must inform tipped employees of its use of the tip credit. *Kilgore*, 160 F.3d at 298. The FLSA requires that the tipped employee be "informed by the employer of the provisions of this subsection . . . ." 29 U.S.C. § 203. The Department of Labor issued regulations, 29 C.F.R. § 531.59(b), requiring employees to be informed of the following:

> (1) the amount of the employee's cash wage, (2) the amount of the tip credit claimed by the employer, (3) that the amount claimed may not exceed the value of the tips actually received, (4) that all tips received must be retained by the employee, except that "the pooling of tips among employees who customarily and regularly receive tips" is permitted, and (5) that the tip credit shall not apply to any employee who has not been informed of all of these requirements.

*Crowell*, 670 F. Supp. 3d at 581 (citing 29 U.S.C. § 203(m)(2); 29 C.F.R. § 531.59(b)). Although several courts have deferred to this regulation and found it to be consistent with FLSA, the Sixth Circuit has not yet directly considered the validity. *Crowell*, 670 F. Supp. 3d at 581. Moreover, the Supreme Court clarified in *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 413 (2024), that courts "may not defer to an agency interpretation of the law simply because a statute is ambiguous" and "instead of declaring a particular party's reading 'permissible' in such a case, courts use every tool at their disposal to determine the best reading of the statute and resolve the ambiguity."

In any event, at a minimum, the employer must ensure the employee is "informed" that the employer "intends to treat tips as satisfying part of the employer's minimum wage obligation" but

need not "explain" the tip credit. *Kilgore*, 160 F.3d at 298; *Solis v. Min Fang Yang*, 345 F. App'x

35, 38 (6th Cir. 2009); *McFarlin v. Word Enters.*, No. 16-CV-12536, 2018 WL 1410827, at *2

(E.D. Mich. Mar. 21, 2018).

Here, Defendants rely on purported written and oral notices, including a notification form,

a poster, and oral communications.

### a. Notification Form

Turning first to the notification form, which Defendants implemented the document in

November 2021, after this case was filed. (ECF No. 107-1 at 8, 21). The form outlines the tip credit

and included a line for the tipped employee to sign. (*Id.*; ECF Nos. 106-12, Ex.64; 106-2 at 144,

Ex.21). The form explains the employee's wage, tip credit amount, that the tip credit cannot exceed

actual tips received, that employees keep all their tips except when pooled, and that the tip credit

applies only if employees are informed about it. (ECF Nos. 106-12 at Ex. 64; 106-2 at Ex. 21).

Plaintiffs do not dispute the existence of the notification form but argue that the form is

insufficient to provide the requisite notice. Notably, they do so without offering any substantive

explanation or legal support for this position. (ECF No. 114 at 3). Indeed, Plaintiffs acknowledge

that "[o]ther than the notices Defendants created and distributed . . . after this lawsuit was filed,

Defendants failed to cite any record evidence identifying specific facts showing that any manager

working for Defendants . . .  during the proposed class period provided Plaintiffs with notice of

the tip credit under 203(m) and notice of all five required notice items in writing as required by 29

C.F.R. § 516.28(a)(3)." (ECF No. 114 at 4).

By itself, this notification form does not establish that Plaintiffs received adequate notice

during the relevant time period. No evidence shows that these notification forms were given to all

Plaintiffs. While a signed notification form may suffice to satisfy notice requirements for claims

arising after November 2021, the record viewed in the light most favorable to Plaintiffs is insufficient to show if and when all Plaintiffs in this case received the form. Accordingly, if any Plaintiff signed this notification form, their notice claims end on the date they signed the form.

### b. Posters

As to the posters, Defendants argued that the restaurants had prominently displayed posters approved by the DOL in their restaurants throughout Plaintiffs' employment and contain the required information. (ECF No. 107-1 at 21). Plaintiffs admitted that the poster was on a bulletin board at her employment throughout her term. (ECF No. 106-5 at 29). The posters—measuring at approximately 3 feet by 2 1/2 feet—included information about the cash wage for tipped employees. They explained that the tipped employee must be paid a certain amount if their employer "claim[s] a tip credit against their minimum wage obligation." (ECF No. 106-5 at Ex. 2). It also provided notice that "[i]f an employee's tips combined with the employer's cash wage of at least $4.35 per hour do not equal the minimum hourly wage, the employer must make up the difference." (*Id*.; ECF Nos. 106-5 at 102-05, Ex.2; 106-1 ¶13; 106-7 at 77-78; 106-13 at 61-63).

As a threshold matter, there is a genuine issue of material fact regarding whether the posters were prominently displayed throughout the relevant period of this case. While some Plaintiffs admitted seeing tip credit posters on employee bulletin boards (ECF No. 106-4 at 27-28), others deny ever seeing a poster or being directed to review the poster. (ECF Nos. 106-9 at 46; 106-6 at 37; 106-8 at 99; 110-4 at 33; 110-8 at 36).

Even if there is no issue as to the prominent display of the posters, Plaintiffs dispute their sufficiency under § 203(m). Plaintiffs rely on other courts findings that the similar language used in Defendants' poster failed to meet the FLSA notice requirements. *Crowell v. M St. Ent., LLC*, 670 F. Supp. 3d 563, 581 (M.D. Tenn. 2023). The posters in *Crowell*, like the posters in this case,

"identify the federal minimum wage as $7.25 and refer generically to FLSA requirements that permit employers 'who meet certain conditions' to claim a partial wage credit based on tips receive[d] by their employees,' that such employers 'must pay tipped employees a minimum of $2.13 if they claim a tip credit against their minimum wage obligation,' and that the employer must make up the difference if the cash wage plus tips is less than minimum wage." *Crowell*, 670 F. Supp. 3d at 587. The court concluded that this document failed to "constitute the *defendants'* informing the plaintiffs that *they* specifically meet the referenced conditions and intended to take a tip credit against the minimum wage, nor does the poster provide the additional information required by § 203(m)." *Id*. The court further observed that "courts have 'almost universally rejected the argument that such a generic government poster can satisfy the notice obligations under § 203(m).'" *Id*. (quoting *Galleher v. Artisanal, LLC*, No. 1:19-cv-55-MOC-WCM, 2021 WL 243868, at *8 (W.D.N.C. Jan. 25, 2021).

Although *Crowell* is not binding on this Court, the holding aligns with the Sixth Circuit's holding in *Kilgore*. There, the court held that a notice requires indication of the employers' intention to use the tip credit. 160 F.3d at 298. The Sixth Circuit distinguished the facts in *Kilgore* from a case where an employer relied on vague conversations about the minimum wage plus a single poster with "some or all of the relevant information," and held that such information does not establish the notice required by subsection 203(m). *Id*. at 299 (quoting *Bonham v. Copper Cellar Corp.,* 476 F. Supp. 98 (E.D.Tenn.1979)). In contrast, the employer in *Kilgore* submitted an affidavit asserting that when certain plaintiffs applied, they were given a file folder and were asked to read the file. The file folder described the tip policy, stating "I understand that the practice of sharing tips among tipped employees is approved by [the employer]. Further, I understand that tips will be used as a credit against the minimum wage as permitted by federal and/or state law."

It also fully quoted 29 U.S.C. § 203(m). *Id.* at 299. The plaintiff did not deny receiving the file folder. The court found that "the content of the written notice provided by [the employer] here satisfies the express requirements of subsection 203(m). No material issue of fact exists as to whether plaintiff Kilgore received this notice." *Id.*

In the case *sub judice*, however, although seen by some Plaintiffs, the poster does not expressly indicate that Defendants *intended* to treat tips as satisfying part of their minimum wage obligations. The West Virginia poster indicates that employers are allowed to make such choice and if so, what the law requires. (ECF No. 116-1 at 131). Similarly, the Ohio poster defines tipped employees and explains what employers must do when electing to use the tip credit. (ECF No. 106-5 at 102-05, Ex.2 p.2). Neither poster, however, indicates that the employer intended to use the tip credit.

### c. Oral Communication

Defendants also contend that the required notice was communicated orally. They explain that "many of the employees expressly admitted that they were told about the tip credit either during the interview or orientation." (ECF No. 107-1 at 21). This included Plaintiffs admitting that they were told the rates of pay and tip information when they interviewed for positions with Defendants (ECF No. 106-7 at 42-44, 46-47) or that they understood the tipped wage (ECF No. 106-9 at 25-27, 41-42). Defendants neither admit nor adduce evidence that they advised Plaintiffs of their intent to use the tip credit. In fact, the managers admit to being unaware of a policy requiring employees to be told anything more than the employee's hourly rate. (ECF No. 109-9 at 150-51). Moreover, some Plaintiffs, specifically Pender, denied knowing what the rate of pay was before accepting the job. (ECF No. 106-5 at 34-35). As such, there is a genuine issue of material fact as to whether Defendants met the notice requirement through oral communications alone.

17

While the posters and oral statements alone may be insufficient, they each may nonetheless be relevant for providing adequate notice if provided along with other forms of notice. Employers may inform employees of the tip credit orally, in writing, or through a combination of oral and written sources. *See, e.g.*, *Schaefer*, 829 F.3d at 558 (holding that "§ 203(m) does not say that all of the information must be in a single document. The handout plus the poster collectively supplied the information required by federal law . . . "). During oral argument, Defendants emphasized the sufficiency of the notice provided on the posters "in conjunction" with oral communications.

Even so, there remains a genuine issue of material fact with respect to the posters and the oral communications. Specifically, unresolved questions remain as to: (1) whether the posters were provided at each location over the relevant time of this case; (2) whether those who saw the posters or were told to review the posters were informed orally, or in some other form, of the employer's *intent* to use any tax credit for that employee's pay. Accordingly, both Plaintiffs' and Defendants' motions for summary judgment on the notice issue are denied.

### 3. Payment for Non-Tipped Work

Turning to the specific work performed, Plaintiffs claim that they were paid a subminimum hourly wage in violation of FLSA while performing: (1) non-tipped work *related* to the tipped work that exceeded 20% of their time; and (2) non-tipped work that is *unrelated* to their jobs as servers and bartenders. (ECF No. 42 ¶ 91).

Defendants move for summary judgment arguing that neither the related nor unrelated non-tipped work negated the use of tip credit for Plaintiffs' wages. (ECF Nos. 107-1 at 22-27; 116 at 3-8). Plaintiffs moved for partial summary judgment on only the issue of the unrelated non-tipped work for subminimum hourly wage. (ECF No. 108-1 at 17).

18

*a. Regulatory Background*

Whether non-tipped work may be paid at a tipped wage is a common issue arising when the employee spends part of their time performing tip-producing work, and other time on non-tipped tasks. This issue was addressed in 1967, under 29 C.F.R. § 531.56(e), in the "Dual Jobs Regulation." The regulation explains that when an employee has a "dual job,"—e.g., "a maintenance man in a hotel also serves as a waiter"— the employee essentially has two occupations and "no tip credit can be taken for the employee's hours of employment" in the non-tipped work. 29 C.F.R. § 531.56(e) (1967). Conversely, when a tipped employee performs duties related to the tipped position—such as "a waitress who spends part of her time cleaning and setting tables, toasting bread, making coffee and occasionally washing dishes or glasses"—the situation is distinguishable from having dual jobs. *Id.* Courts have found that "the 1967 dual jobs regulation is entitled to *Skidmore* deference and has the power to persuade." *Harding v. Steak N Shake, Inc.*, 745 F. Supp. 3d 571, 583 (N.D. Ohio 2024) (citations omitted) ("The history of the regulation shows that it was promulgated after months of thorough consideration through the notice and comment process. The reasoning behind this regulation is valid: to implement the 1966 amendments to the FLSA, including the newly created tip credit. The dual jobs regulation is consistent with Congress's pronouncement of the need for a tipped minimum wage.").

Over time, the DOL issued guidance interpreting the Dual Jobs Regulation. This includes the 1988 guidance in its Field Operations Handbook ("1988 Guidance") where the DOL explained:

> "First, an employer may not claim a tip credit for time an employee spent on duties that were unrelated to the tipped occupation. Second, an employer may claim a tip credit for time an employee spent performing duties related to the tipped occupation so long as 'those duties were not performed by that employee for more than twenty percent of her working hours.'"

*Harding*, 745 F. Supp. 3d at 580 (quoting *Haase v. Cameron Mitchell Rests., LLC*, No. 2:23-cv-1316, 2024 WL 23159, at *2 (S.D. Ohio Jan. 2, 2024)). Like the 1967 Dual Jobs Regulation, courts find that the 1988 Handbook and the 80/20 rule are persuasive authorities. *Id*. at 585.

In 2018, the DOL rescinded the 1988 Guidance through an opinion letter ("2018 Letter") that effectively eliminated the restriction the 80/20 Rule placed on the amount of time an employee could spend performing duties related to a tip-producing occupation. *Id.* (quoting *Haase*, 2024 WL 23159, at *2 ). Under this guidance, if tasks related to a tip-producing role are performed alongside direct customer-service duties, the employer may take a tip credit for the entire time spent on those related tasks. *Id*. It instructed employers to consult the "tasks" section of the Occupation Information Network ("O*NET"), to help determine whether a duty is related to a tipped occupation and therefore eligible for the tip credit. *Id*.; *Matusky v. Avalon Holdings Corp*., 379 F. Supp. 3d 657, 666 (N.D. Ohio 2019). Several federal courts, however, declined to afford *Aue*r or *Skidmore* deference to the 2018 Letter. *See O'Neal v. Denn-Ohio*, LLC, No. 3:19-CV-280, 2020 WL 210801, at *8 (N.D. Ohio Jan. 14, 2020); *Rafferty v. Denny's*, Inc., 2021 WL 4189698, at *18 (11th Cir. Sept. 15, 2021); *Harding*, 745 F. Supp. 3d at, 587; *Flores v. HMS Host. Corp.*, No. 8:18-cv-03312, 2019 WL 5454647 (D. Md. Oct. 23, 2019).

In 2021, a new rule was introduced under 29 C.F.R. § 531.56 where employers may claim a tip credit for "work that is part of the tipped occupation" which includes both "work that produces tips; and work that directly supports the tip producing work, if the directly supporting work is not performed a substantial amount of time" ("2021 Regulation"). *Id*. The 2021 Regulation defined "substantial amount of time" as exceeding a 20% of a workweek or 30 continuous minutes. *Id*.

In 2024, the Fifth Circuit concluded that the 2021 Regulation was arbitrary and capricious and contrary to the text of the FLSA. *Rest. L. Ctr. v. U.S. Dep't of Lab.*, 120 F.4th 163, 171 (5th

Cir. 2024) (applying *Loper Bright*). The Fifth Circuit vacated the 2021 Regulation nationwide, and the DOL did not seek certiorari from the Supreme Court. *Id.* at 177; *Popp v. Brewdog Brewing Co., LLC*, No. 2:24-CV-338, 2025 WL 345980, at *3 (S.D. Ohio Jan. 30, 2025); *see also Hallman v. Flagship Rest. Grp.*, *LLC*, No. 8:24CV222, 2025 U.S. Dist. LEXIS 7585, at *14, 2025 WL 101085 (D. Neb. Jan. 15, 2025) (analyzing the effect of the Fifth Circuit's vacatur on other district courts outside the Fifth Circuit); *Green v. Perry's Restaurants Ltd*., 758 F. Supp. 3d 1312, 1317 (D. Colo. 2024).

Following the Fifth Circuit's decision, district courts have found that dual jobs and 80/20 claims arising under the FLSA are still permissible theories of recovery notwithstanding the vacatur of a 2021 amendment to the FLSA's regulations. *See, e.g.*, *Hallman v. Flagship Restaurant Grp.*, LLC, 2025 WL 101085, at *5 (D. Neb. Jan. 15, 2025) (denying motion to dismiss 80/20 claims post-*Rest. Law Center); Popp v. Brewdog Brewing Co.*, LLC, 2025 WL 345980, at *2 (S.D. Ohio Jan. 30, 2025) (denying motion to dismiss 80/20 claims post-Rest. Law Center); *Green v. Perry's Restaurants Ltd*., 2024 WL 4993356, at *2 (D. Colo. Dec. 5, 2024) (finding that 1988 FOH Guidance remains valid after Restaurant Law Center and "as the law currently stands, Plaintiffs are free to base their claims on the 80/20 Rule"); *see also Harding*, 745 F. Supp. 3d at 582 (applying *Loper Bright* and finding that the 1967 dual jobs regulation is entitled to *Skidmore* deference and has the power to persuade, and finding the 1988 Handbook and 80/20 rule are persuasive authorities and applicable).

In *Popp*, for example, the court recognized that, as a result of the vacatur, "the law returns to the status quo under the 1967 dual jobs regulation." *Popp* , 2025 WL 345980, at *3 (citing *Hallman*, 2025 U.S. Dist. LEXIS 7586, at *15, 2025 WL 101085 (applying the 2019 version of the dual jobs regulation and pre-80/20 Rule case law); *Green v. Perry's Rests. Ltd.*, Civil Action

No. 21-cv-0023-WJM-NRN, 2024 U.S. Dist. LEXIS 219993, at *10, 2024 WL 4993356 (D. Colo. Dec. 5, 2024) (explaining that the vacatur "preserve[d] that portion of the 2021 Final Rule withdrawing the 2020 Final Rule's *different* revisions to the Dual Jobs Regulation, which was unchallenged[.]")) Thus, the current operative version of the dual jobs regulation provides:

> In some situations an employee is employed in a dual job, as for example, where a maintenance man in a hotel also serves as a waiter. In such a situation the employee, if he customarily and regularly receives at least $30 a month in tips for his work as a waiter, is a tipped employee only with respect to his employment as a waiter. He is employed in two occupations, and no tip credit can be taken for his hours of employment in his occupation of maintenance man. Such a situation is distinguishable from that of a waitress who spends part of her time cleaning and setting tables, toasting bread, making coffee and occasionally washing dishes or glasses. It is likewise distinguishable from the counterman who also prepares his own short orders or who, as part of a group of countermen, takes a turn as a short order cook for the group. Such related duties in an occupation that is a tipped occupation need not by themselves be directed toward producing tips.

*Popp*, 2025 WL 345980, at *4 (quoting 29 C.F.R. § 531.56(e) (1967 version; current version)).

At issue in the pending motions for summary judgment is whether Plaintiffs' non-tipped work qualifies as related or unrelated to their primary tipped occupation, and whether such work entitles them to compensation at the full minimum wage under the Dual Jobs Regulation and the 80/20 Rule as embodied by the DOL's subregulatory guidance. *See, e.g.*, *Green*, 758 F. Supp. 3d at 1320.

### b. Non-Tipped Work Related to the Tipped Work that Exceeded 20% of Time

Plaintiffs claim that Defendants routinely required Plaintiffs to perform a variety of non-tipped duties related to their tipped occupations. These duties include workplace maintenance tasks such as filling salt and pepper shakers; setting tables; rolling silverware; cutting lemons; and making specialty drinks such as lemonades and iced teas. (ECF No. 42 ¶ 66). In the motion for summary judgment, Defendants request that this Court dismiss any claim based on the 80/20 Rule, arguing that the rule is no longer valid following the vacatur of the 2021 Regulation. (ECF No.

107-1 at 23-26). As explained above, although the Fifth Circuit in *Rest. Law Ctr*. vacated the 2021 Regulation which effectively restored the status quo of the 1967 Dual Regulation, the 1988 Guidance and the 80/20 Rule remain persuasive authorities and will assist in analyzing issues in this case.

While there is ample evidence that Plaintiffs performed non-tipped work related to their tipped work, it is unclear how much time was spent on that work. As Defendants point out, "even if the Court determines that the 80/20 Rule remains viable," Plaintiffs failed "to present competent evidence that they performed more than 20% of their tipped-rate time performing tip-supporting work." (ECF No. 116 at 8).

In *Harding*, for example, the court similarly applied both the 1967 Dual Jobs Regulation and the 80/20 Rule to the plaintiffs' FLSA claim and found there was a dispute of material fact as to whether the employer improperly claimed a tip credit. *Harding*, 745 F. Supp. 3d at 590-91. The parties did not dispute that the plaintiffs  performed "work like cleaning and setting tables, making tea and coffee, rolling and stocking silverware, stocking and refilling condiments, cleaning booths and the dining area, stocking paper supplies and drinks, mopping spills, and cleaning the dining area." *Id*. The issue, however, was the time spent on those tasks. Testimony was offered that the plaintiffs "worked at least one week where more than 20% of the time they spent at work . . . without customers and, therefore, without the opportunity to earn tips from customers." The court found this was insufficient because it failed to establish the type of work plaintiffs performed. Similarly, testimony that the plaintiffs were engaged in "things other than the serving duties" and "side work" was inadequate to distinguish between time spent performing unrelated work and tip-supporting work. The court noted the "testimony may ultimately support Plaintiffs' claims but

does not establish that Plaintiffs spent over 20% of their shifts on tip-supporting work." *Id*. at 590–91.

Here, Plaintiffs offer evidence of time spent on performing duties such as making tea, stocking, doing dishes, and cleaning tables (ECF Nos. 106-8 at 81-82; 106-8 at 49-52; 106-5 at 200-03; 106-6 at 88-89). Plaintiffs argue "[t]herefore the question of whether the sidework was 'substantial' enough under the Dual Jobs regulation is a question for a factfinder." (ECF No. 114 at 12). This position aligns with *Harding*, the Dual Regulation, 1988 Guidance, and the 80/20 rule.

Accordingly, granting summary judgment is improper on the issue of the related non-tipped work.

### c. Non-Tipped Work Unrelated to Tipped Work

Similarly, in the Second Amended Complaint, Plaintiffs allege that they were required to perform maintenance, dishwasher, and janitorial work unrelated to their roles as servers and bartenders. (ECF Nos. 42 ¶ 61; 114 at 7). Under the Dual Jobs Regulation "no tip credit can be taken for the employee's hours of employment" spent on unrelated non-tipped work. 29 C.F.R. § 531.56(e) (1967). Plaintiffs assert that, aside from the time spent opening the restaurant, Defendants paid Plaintiffs a subminimum hourly wage for the time that they were performing these unrelated non-tipped duties. (*Id*. ¶ 64). This includes during a shift, after the restaurant was closed, or during a shift change. (*Id*.).

Both parties move for summary judgment on this issue.

### i. Work Constituting "Unrelated" Work

Plaintiffs move for summary judgment, arguing that Defendants required them to perform work unrelated to their roles as tipped employees—including maintenance work, janitorial tasks,

24

kitchen work as expos, and dishwashing—while paying subminimum wages. (ECF No. 108-1 at 17-21).

Under the Dual Jobs Regulation, a court's analysis hinges upon whether an employee's untipped duties are "related" to their tipped occupation, as well as the frequency with which those duties are performed. *Harding*, 745 F. Supp. 3d at 588 (citing *Harrison v. Rockne's Inc*., 274 F.Supp.3d 706, 710 (N.D. Ohio 2017); *see also Marsh v. J. Alexander's LLC*, 905 F.3d 610, 626 (9th Cir. 2018) ("The dual jobs regulation relies on two undefined factors to determine whether an employee is a dual-job employee: (1) the relatedness of an employee's duties to a tipped occupation and (2) the amount of time an employee spends on completing related but untipped duties."). Plaintiffs are required to show "more than de minimis claims based on seconds or minutes spent" performing unrelated tasks. *Harding*, 745 F. Supp. 3d at 588 (quoting *Marsh*, 905 F.3d at 631).

Defendants argue that Plaintiffs misstate which duties are unrelated to the tipped occupation and primarily rely on O*NET, an online database developed under the sponsorship of the DOL. [4] (ECF Nos. 112 at 10; 116 at 5). O*NET provides "'work attributes and job characteristics,' to determine 'which duties are related to a tipped occupation.'" *Harding*, 745 F. Supp. 3d at 580 (quoting *O'Neal*, 2020 WL 210801, at *5). As explained above, under the 2018 Letter, employers were directed to O*NET to determine whether they may take a tip credit for certain tasks. *Matusky*, 379 F. Supp. 3d at 666.

The 2018 DOL Letter that encouraged reliance on O*NET, however, has been rejected by courts and the reliance on O*NET has also been criticized. The 2018 Letter allowed employers to require tipped employees to perform untipped duties notwithstanding whether they were related to the tipped duties and "effectively recharacterize those untipped duties as 'related.'" *Rafferty v.*

---

[4] O*NET Resource Center, https://www.onetcenter.org/overview.html (last visited Aug. 19, 2025)

*Denny's, Inc*., 13 F.4th 1166, 1185 (11th Cir. 2021). Moreover, "[i]f employers assign tipped employees duties traditionally performed by non-tipped employees, the O*NET definitions will reflect this and the protections established by the dual jobs regulation will erode." *Harding*, 745 F. Supp. 3d at 585 (quoting *O'Neal*, 2020 WL 210801, at *6). This reliance on O*NET blurs the distinction the law seeks to preserve. As such, this Court declines to define unrelated work solely by reference to the tasks described on O*NET.

Nonetheless, this Court finds it prudent to distinguish the unrelated work for purposes of Plaintiffs' Dual Job Regulations claim. In support of their motion for partial summary judgment on this claim, Plaintiffs have submitted evidence demonstrating their performance of work allegedly unrelated to their tipped occupations. This includes both testimonial evidence and employer policies reflecting that: (1) servers and bartenders were assigned daily opening duties, shift change duties, closing duties; and tasks that included cleaning various parts of the restaurant and engaging in food preparation; (2) Plaintiffs were required to clean bathrooms, specifically checking and stocking the bathroom (ECF No. 114 at 7); (3) Plaintiffs performed duties in the role of expos; and (4) Plaintiffs undertook dishwashing responsibilities during their shifts. (ECF Nos. 108-1 at 19; 114 at 7-10). The Court will address each category of alleged unrelated work in turn.

***Daily opening, shift change, and closing duties.*** With respect to Plaintiffs' assigned opening, shift change, and closing duties, the tasks alleged by the Plaintiffs closely resemble those examined in other cases where the Court categorized the work as unrelated to a tipped occupation. In *Harding*, for example, the court found that the following tasks as "unrelated to serving":

> working the grill line and performing the primary job duties of cook; performing the primary job duties of a host or hostess; taking out trash; scrubbing walls; sweeping and mopping floors; cleaning booths; operating the dishtank and performing the primary job duties of a dishwasher; breaking down and cleaning the server line; ensuring the general cleanliness for the front of the house; detail cleaning throughout the restaurant; stocking stations throughout the restaurant; stocking ice; preparing delivery orders Uber Eats, Grub

> Hub and Door Dash; preparing takeout orders and online orders from [the employer website]; answering the phone; working the cash register; greeting and seating customers; preparing salads; preparing deserts, ice creams and milkshakes; cutting lemons, limes, melons and strawberries; washing and stocking unsliced fruits; baking biscuits; preparing specialty drinks such as lemonades, limeades and teas; and rolling bins full of silverware

*Harding*, 745 F. Supp. 3d at 588 (quoting *O'Neal v. Denn-Ohio, LLC*, No. 3:19-CV-280, 2020 WL 210801, at *8 (N.D. Ohio Jan. 14, 2020)). The court concluded that tasks such as these, when listed in corporate policies and assigned to servers as part of their daily duties and responsibilities, amounted to more than occasional requests and instead constituted a continuous practice occurring each shift. *Id*. (quoting *Marsh v. J. Alexander's LLC*, 905 F.3d 610, 631 (9th Cir. 2018)).

Here, Plaintiffs have established that during opening shift, Defendants' policies required the tipped employees to clean and sanitize all tables, chairs, and booths including the table and chair legs; sweep the parking lot; pick up cigarette buds around the building; remove trash; clean blinds, door handles, and door glass; and roll out welcome mats. (ECF No. 109-2). During shift change they were again expected to clean and sanitize all tables, chairs, and booth, ensure dishes were washed and put away, empty trash, and take all trash to the dumpster. (ECF No. 110-7). Closing duties similarly included substantial cleaning and preparation work, such as restocking soda and server stations, cleaning soda machine and nozzles, washing lemon containers, sweeping, mopping, vacuuming, and removing trash. (ECF No. 110-4).

As in *Harding*, these tasks were unrelated to tipped work and formed part of a routine, systemic practice rather than isolated or incidental assignments. This supports a finding that the unrelated tasks exceeded "the occasional request" and was instead part of a "continuous practice" that occurred each shift. *Harding*, 745 F. Supp. 3d at 588 (quoting *Marsh*, 905 F.3d at 631).

***Dishwashing***. Plaintiffs also presented compelling evidence that dishwashing was a regular, assigned duty rather than an occasional task. (ECF Nos. 108-1 at 7-8; 117 at 13).

Defendants assert that the work was janitor work related to the Plaintiffs' tipped occupation as it included duties akin to bussing tables. (ECF No. 112 at 9). Defendants argue that "occasionally" doing this does not entitle Plaintiff to minimum wage. (*Id*. at 11). Plaintiffs, however, detailed the extent and frequency of their dishwashing duties. While there was a dishwashing machine, it was meant to sanitize. Servers were expected to scrape and rinse the dishes to remove debris before loading them into a sanitizing dishwashing machine and then return the cleaned dishes to their proper locations. (ECF Nos. 106-7 at 116-117;106-8 at 117-118; 106-9 at 68-69; 106-12 at 60; 106-13 at 52). Multiple servers reported that there was often no one designated as the dishwasher, so the duty instead routinely fell on the servers to complete the task. (ECF Nos. 106-7 at 123; 106-8 at 134; 106-12 at 32-33, 60; 106-10 at 18-19). Several testified that they had to hand-dry dishes and perform dishwashing multiple times per shift, sometimes as many as ten times. (ECF Nos. 106-5 at 94-95; 106-6 at 91-92; 106-7 at 118-120; 106-9 at 70).  The time required varied from a few minutes to as long as 30 minutes per shift. (ECF Nos. 106-8 at 134; 106-13 at 149). This level of involvement goes well beyond "occasional" and supports the conclusion that dishwashing was an unrelated and regularly assigned duty.

*__Cleaning bathrooms__*. With respect to bathroom cleaning, servers explained that, if the host position was short-staffed, servers were required to clean the bathrooms as part of their closing duties. (ECF No. 106-8 at 67). Bathroom cleaning responsibilities included checking, restocking, and mopping the restrooms. (ECF Nos. 106-6 at 95; 106-7 at 104–06; 106-8 at 67; 106-9 at 50). Nonetheless, some merely explain mopping the bathrooms as part of their regular closing duties (ECF Nos. 106-7 at 104-105; ECF No. 106-9 at 50).

Defendants do not directly dispute the unrelated nature of the bathroom cleaning duties. Instead, they contend that such tasks were normally assigned to the cashier and, if performed by a

server in the cashier's absence, were intended to be compensated at the full minimum wage. (ECF No. 112 at 9). Based on the evidence, it is unclear whether this unrelated task was an occasional request.

*Expo Work*. Finally, Plaintiffs assert that they regularly performed work as expos, but there is a disagreement on the extent of that work. While Defendants describe the expo role as limited to traying and delivering food (ECF No. 112 at 9), testimony suggests that the role involved significantly more. Beltran explained that an "outside" expo:

> Outside expo's responsibilities are to control the flow of the restaurant between the serving staff and the kitchen.· They help direct the kitchen.· They call ·back ticket times.· We have a screen that they operate, which they toggle through each station to make sure that everything is being prepared up to the Buffalo Wild Wings standards.· They -- they pump the ranch or blue cheese for each order.· They ensure that all sides are on . . . the small tray.· Any kind of issues they have with an order, they communicate that with the kitchen and their station on that part, and then they tray up the food.

(ECF No. 106-2 at 88). Some servers described fulfilling the expo duty by preparing takeout orders, side sauces, weighing celery and carrots and bagging them. (ECF Nos. 106-6 at 93; 106-7 at 133; 106-13 at 124). They also described a designated workstation in the kitchen for the expo. (ECF Nos. 106-6 at 93; 106-8 at 119). Several have also explained that when no one designated to complete the expo tasks worked at the restaurant, servers filled the position. (ECF Nos. 106-5 at 160, 177; 108-8 at 116, 119). At least one server estimated spending at least one to two hours during a five-hour shift in total doing greeting and expo work. (ECF No. 106-13 at 123-124). To the extent these tasks extended beyond serving one's own customers and involved kitchen-based preparation and coordination, the work appears to be more than incidental to the server role.

Both parties discuss expo work in the context of *Roussell v. Brinker Int'l, Inc.*, 441 F. App'x 222 (5th Cir. 2011). (ECF Nos. 112 at 13; 117 at 19). In *Roussell*, the Fifth Circuit considered whether servers in a quality assurance ("QA") role—a position akin to an expo—performed duties

that were incidental to a server's job. 441 F. App'x at 232. The court addressed the argument that "the duties of the two positions were sufficiently related such that a Server who took a turn working a shift as a QA could be deemed to remain in the occupation of Server." *Id*. The undisputed facts were that the servers clocked in as quality assurance workers for an entire shift, performed those duties only, and were paid the full minimum wage for those shifts. The court found that these undisputed facts presented a clear dividing line between the server position and QA position because "'even when the nontip-producing duties are related to a tipped occupation, if they are performed for an entire shift, the employee is not engaged in a tipped occupation'" and "[i]t follows that servers working an occasional QA shift are, just like QAs, ineligible to participate in mandatory tip pools during those shifts." *Id*. at 233; *see also Roussell v. Brinker Int'l, Inc.*, No. CIV.A. H-05-3733, 2008 WL 2714079, at *13 (S.D. Tex. July 9, 2008) ("[S]ervers may perform QA tasks intermittently during their shifts as servers when no QA is on duty. The Court agrees that such work likely can be considered incidental to a server's job when performed intermittently. In this lawsuit, however, this issue before the Court is the status of specific servers that work entirely separate shifts as QAs. On these shifts, servers perform only QA duties.").

In contrast, here, Plaintiffs do not claim they worked entire shifts as expos. Rather, they allege that expo duties were incorporated into their server shifts. Indeed, working the expo shift would not be "incidental" to the server job. *See Roussell v. Brinker Int'l, Inc*., No. CIV.A. H-05-3733, 2008 WL 2714079, at *13 (S.D. Tex. July 9, 2008) ("That the servers would have performed the QA tasks themselves when no QA was on duty does not make the QA shift work "incidental" to the server job."). Even so, this incidental work, if performed more than 20 percent of the time, may still be entitled to full minimum wage. *Id*. at *12.

Given the lack of consistency and detailed information on the expo work regularly performed by servers, a genuine issue of material fact exists as to whether fulfilling the role as expo was unrelated work for the server. At minimum, the evidence suggests that the duties implicate the 80/20 Rule. *See, e.g.*, *Id*. ("Thus, an employer may take a tip credit for all of an employee's time even if the employee is required to perform certain duties incidental to her main job that are not considered 'tipped' work, as long as those duties are generally assigned to employees in that position and the employee does not spend more than 20 percent of her time performing the incidental tasks."); *Harding*, 745 F. Supp. 3d at 587 (finding an employer may claim a tip credit for time servers performed tip-supporting work so long as tip-supporting work did not exceed 20% of a server's working hours).

### ii.    *Payment For Unrelated Work*

Plaintiffs have established that they regularly performed unrelated work and were engaged in dual jobs when completing maintenance and janitorial work during their opening, shift change, and closing tasks. While there were occasions when servers clocked into "meeting" or other full minimum wage job classifications while completing this work, the record also reflects numerous instances in which they did not. (ECF No. 106-8 at 104-110, 114-117; 106-9 at 63-65; 106-11 at 38-39; 106-13 at 41). Rather than dispute whether this work was performed without the full minimum wage rate, Defendants argue that the employees should have clocked in under the full minimum wage job classifications. (ECF No. 112 at 6-8).

First, Defendants argue entitlement to summary judgment for claims related to payment of any non-tipped work performed in accordance with the opening duties during an opening shift. (ECF No. 107-1 at 26). Plaintiffs did not directly respond to this point, and the Second Amended Complaint states that "when assigned to an opening shift, Defendant paid Plaintiff and the

Collective Members the full minimum wage to perform opening tasks" (ECF No. 42 ¶64, n.1). Given there is no genuine issue as to whether Plaintiffs were paid full minimum wage for their opening tasks on opening shift, summary judgment is granted on this narrow issue.

Defendants also contend that summary judgment is warranted because a policy existed providing for payment at the full minimum wage for non-tipped work completed as part of the closing duties. (ECF No. 107-1 at 26-27). Specifically, they assert that the janitorial work "was supposed to be performed at the full minimum wage." (ECF No. 116 at 4). Defendants rely on *White v. Baptist Memorial Health Care Corp.*, 699 F.3d 869 (6th Cir. 2012), which held that "[U]nder the FLSA, if an employer establishes a reasonable process for an employee to report uncompensated work time the employer is not liable for non-payment if the employee fails to follow the established process." That case, however, involved claims of uncompensated overtime work during missed or interrupted meal breaks, not the tip credit provisions at issue here.. *Id.* (ECF No. 117 at 16). The *White* court emphasized that, "if an 'employer knows or has reason to believe that [a worker] is continuing to work [then] the time is working time.'" *White*, 699 F.3d at 873 (quoting 29 C.F.R. § 785.11). With this standard in mind, the court held that an employer is not liable under FLSA if it establishes "a reasonable process for an employee to report uncompensated work time" and the employee fails to follow the process. *Id.* at 876.

Even assuming the *White* framework applies in the tip credit context, the record, when viewed in the light most favorable to Plaintiffs, supports a finding that Defendants either failed to maintain a reasonable process or otherwise had reason to know that Plaintiffs were not being properly compensated in accordance with their purported policy. Courts have rejected the argument that an employer's policy shields it from liability where evidence reflects inconsistent application or failure to adhere to that policy in practice. In *Harding*, for example, the employer

did not dispute that the tipped employees performed unrelated work without being switched to full minimum wage and "the record also show[ed] that at some, though not all, times Plaintiffs were paid the full minimum wage for time spent performing unrelated work." *Harding*, 745 F. Supp. 3d at 589. There, the managers testified that if a server performed dual jobs, it was their practice and the employer's policy either to clock servers in at the appropriate rate themselves or to make alterations in the timekeeping software after a shift. *Id*. at 578. The court found that the "instances of proper compensation do not excuse the periods where Plaintiffs were not fully compensated for purposes of [the employer's] liability under the FLSA. *Id*. Occasional compliance didn't defeat the claim, especially when substantial evidence showed repeated misapplication of the policy.

Similarly, in *Driver v. AppleIllinois, LLC*, 890 F. Supp. 2d 1008, 1030–31 (N.D. Ill. 2012), the defendant acknowledged its policy that the tipped servers could act as nontipped general utility or expo workers, but the server should clock in under a job code paying minimum wage when working in that position. The evidence, however, showed little time paid at minimum wage in contrast to the substantial amount of time the servers indicated spending completing the tasks. The court recognized that "[t]here is an obvious financial incentive to avoid scheduling minimum wage employees if tipped employees can be required to do the work at the tip credit rate" and found that "[t]he evidence establishes that AppleIllinois created tipped and non-tipped occupations, and used tipped employees to do the duties of non-tipped employees at tip credit rates." *Id*. at 1031.

Here too, the evidence indicates that Defendants' policy regarding use of the "meeting" code for unrelated work was inconsistently implemented and ineffectively enforced. There is evidence of an opportunity for Plaintiffs to be paid minimum wage when logged in under the "meeting" code while doing unrelated tasks. (ECF No. 106-5 at 158). Some employees recall being trained to clock in under "meeting" before beginning service and then switch to the "server" role

upon taking table. (ECF Nos. 106-13 at 20; 106-5 at 36; 106-7 at 89). Defendants argue that Plaintiffs simply failed to follow this established procedure. (ECF No. 112 at 8). The testimony suggests otherwise. For example, Beltran admitted that he was unaware of any written policy that instructed servers to clock in under "meeting" during closing duties. (ECF No. 106-2 at 78). Servers also report the meeting code was not available during their entire employment or report being told that they were not to use the meeting code. (ECF Nos. 106-4 at 38; 106-6 at 50, 77, 79-80; 106-12 at 114). Moreover, some do not recall being taught about clocking into meeting and out of the server role. (ECF No. 106-11 at 38; 106-6 at 77).

Perhaps more telling is the testimony that management at times made it practically impossible for employees to clock in under "meeting." Some servers recalled that there were times when they could not clock in under meeting because they could not get a manager to do a "checkout." (ECF Nos. 106-11 at 39; 106-8 at 111). One server explained that "to be able to clock in as meeting, I have to have a manager do my checkout. And then once the checkout and the money is given to the manager, then [I can] clock in as meeting." Due to this process, she would start her side work as she waited for a manager. She further explained "it wasn't really pursued with the management. It wasn't like, "You need to clock in as this. You need to wait on me." (ECF No. 106-11 at 39). It was also claimed that managers "would dilly dally and drag their feet or come up with excuses as to why they couldn't" checkout a server so that the server can clock in under "meeting." (ECF No. 106-8 at 111).

As in *Harding* and *Driver*, the record reflects a pattern of inconsistent application of the employer's policy and repeated failures to ensure that employees performing unrelated work were compensated at the full minimum wage. Occasional compliance with the policy does not defeat Plaintiffs' claim. *See Harding*, 745 F. Supp. 3d at 589; *Driver*, 890 F. Supp. 2d at 1031. This

finding is consistent with the purpose of the FLSA and its Dual Jobs Regulation. Congress enacted the FLSA with broad remedial purpose, aiming to protect workers from substandard wages and oppressive working conditions. *Keller v. Miri Microsystems LLC*, 781 F.3d 799, 806 (6th Cir. 2015) (citing *Powell v. U.S. Cartridge Co.,* 339 U.S. 497, 509–11, 515, 70 S.Ct. 755, 94 L.Ed. 1017 (1950)). The FLSA "was designed to extend the frontiers of social progress by insuring to all our ablebodied working men and women a fair day's pay for a fair day's work." *A.H. Phillips, Inc. v. Walling*, 324 U.S. 490, 493 (1945) (internal quotation marks omitted). District courts have found that "A 'fair day's pay for a fair day's work" can only be guaranteed if employers' ability to take the tip credit is limited to when their employees are actually 'engaged in a tipped occupation.'" ! *Belt v. P.F. Chang's China Bistro, Inc*., 401 F. Supp. 3d 512, 538 (E.D. Pa. 2019) (quoting *A.H. Phillips, Inc*, 324 U.S. at 493); see also *Roberson v. Texas Roadhouse Mgmt. Corp*., No. 3:19-CV-628-RGJ, 2020 WL 7265860, at *8 (W.D. Ky. Dec. 10, 2020). Granting summary judgment based on a misapplied and inadequately enforced policy would contravene the remedial purposes of the FLSA, which is designed to protect workers from unfair labor practices and ensure the payment of wages owed. *See, e.g*., *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 214 (2016) (quoting *Barrentine v. Arkansas–Best Freight System, Inc.,* 450 U.S. 728, 739 (1981) ("The federal statute in question is the Fair Labor Standards Act (FLSA), 29 U.S.C. § 201 *et seq.,* enacted in 1938 to 'protect all covered workers from substandard wages and oppressive working hours.'").

Accordingly, with respect to Plaintiffs' motion for partial summary judgment, Plaintiffs request that this Court enter partial summary judgment as to liability, and hold that Plaintiffs are entitled to the full minimum wage for all hours worked for which Defendants claimed a tip credit. There is no genuine dispute of material fact as to whether Defendants claimed tip credit for time Plaintiffs spend on the janitorial and maintenance duties during opening, shift change, and closing.

Given that Plaintiffs concede to receiving payment at full minimum wage during opening shift, summary judgment is granted in favor of the Defendant on claims related to opening duties during the opening shift. (ECF No. 42 ¶ 64). Nonetheless, this Court finds that daily janitorial and maintenance performed during shift change and closing constituted time spent performing unrelated work, in violation of the FLSA. As such, summary judgment is granted in favor of Plaintiffs on the issue of liability under the Dual Jobs Regulation for the janitorial and maintenance-related duties performed during shift change and closing.

### 4. Expenses

Plaintiffs allege that they were required to pay for uniforms, shirts, server books, walked tabs, copies of payroll documents, and other items and expenses in connection with performing their jobs for Defendants. (ECF No. 42 ¶¶ 60, 95). Plaintiffs assert that this invalidates the Defendants' claim to a tip credit under the FLSA. Specifically, Plaintiffs argue that Defendants are divested of the tip credit because: (1) if these expenses were paid out of Plaintiffs' subminimum hourly wage, then their wages fell below the minimum required under the FLSA; or (2) if paid from their tips, then Plaintiffs did not retain all of their tips as required under the statute. *See, e.g.*, 29 U.S.C. § 203(m) ("[A]ll tips received by such employee [must be] retained by the employee"). (ECF No. 114 at 16).

Employee expenses may invalidate the tip credit if those expenses reduce employee compensation below the minimum wage. *See, e.g.*, *Pedigo v. Austin Rumba, Inc*., 722 F. Supp. 2d 714, 721 (W.D. Tex. 2010) (finding employer took improper uniform deductions from the paychecks of its servers, which effectively reduced servers' and bartenders' wages below the minimum wage); *Lopez v. Fun Eats & Drinks*, LLC, 2021 U.S. Dist. LEXIS 132407 (N.D. Tx. July 15, 2021); *Nail v. Shipp*, No. 17-00195-KD-B 2019 U.S. Dist. LEXIS 132072 (D.D. Al. Aug.

6, 2019). Defendants seek summary judgment on this claim, arguing that the undisputed evidence demonstrates that Defendants either supplied Plaintiffs with such items or it was the employees' unilateral choice to purchase these items; and the alleged purchases did not drive wages below the statutory minimum. (ECF Nos. 107 at 28; 116 at 8).

A genuine issue of material fact remains as to whether expenses were for the performance of their job duties and, if so, whether those expenses effectively lowered their compensation below the required minimum wage. For example, Defendants admit to having a dress code requiring servers to wear dark pants and non-slip shoes. (ECF No. 107-1 at 28). While this is not considered a uniform under FLSA, *Garcia v. La Revise Associates LLC*, 2011 WL 135009 (S.D. N.Y. 2011), Plaintiffs were also required to wear a company-issued shirt when hired. Although Defendants state that two shirts were provided upon hire and employees were only charged for additional or alternative apparel (ECF Nos. 106-4 at 31; 106-5 at 213; 106-6 at 30; 106-7 at 69, 138; 106-9 at 32, 34-35; 106-11 at 27-28; 106-12 at 86), multiple servers testified that they bought shirts when they "needed" to buy more. (ECF No. 106-4 at 29-30; 106-6 at 30; 106-12 at 86). When viewed in the light most favorable to Plaintiffs, this evidence raises a triable issue as to whether these purchases were necessary and constituted an expense.

Accordingly, summary judgment is denied as to Plaintiffs claim that they incurred business expenses which negate Defendants' tip credit.

### 5. *Individual Liability*

Defendants also move for summary judgment on claims against the individual defendants, Scott Lloyd and Stephon Green, contending that neither had significant operational control over

the day-to-functions of the restaurants where Plaintiffs worked so as to qualify as an "employer" under the Fair Labor Standards Act (FLSA). (ECF No. 107-1 at 13).

Under FLSA, an "employer" is defined as "any person acting directly or indirectly in the interest of an employer in relation to an employee . . ." 29 U.S.C. § 203(d). Given the FLSA's expansive language, the Sixth Circuit has recognized that the statute "contemplates there being several simultaneous employers who may be responsible for compliance with the FLSA." *Dole v. Elliott Travel & Tours, Inc.,* 942 F.2d 962, 965 (6th Cir. 1991). In addition, "[t]he remedial purposes of the FLSA require the courts to define 'employer' more broadly than the term would be interpreted in traditional common law applications." *Dole,* 942 F.2d at 965 (internal quotation marks and citation omitted). More specifically, "[i]n deciding whether a party is an employer, 'economic reality' controls rather than common law concepts of agency." *Id.* at 965 (citation omitted).

Importantly, a "corporate officer who has operational control of the corporation's covered enterprise is an 'employer' under FLSA, along with the corporation itself." *U.S. Dep't of Lab. v. Cole Enters., Inc.,* 62 F.3d 775, 778 (6th Cir. 1995). An employer may be "[o]ne who is the chief executive officer of a corporation, has a significant ownership interest in it, controls significant functions of the business, and determines salaries and makes hiring decisions . . . ." *Id.* It is also well-established that "[w]hether a party is an employer within the meaning of the FLSA is a legal determination." *Dole,* 942 F.2d at 965.

Plaintiffs assert that Lloyd and Green exercised such operational control, pointing to their involvement in hiring upper-level management and other decision-making responsibilities. were responsible for hiring management personnel to manage the restaurants at their direction. Both Lloyd and Green had ownership interests in the restaurants at issue—Lloyd with two, and Green

with all four establishments. (ECF No. 106-1 ¶¶ 5–6). Both individuals devoted a meaningful portion of their time—approximately 20% (Lloyd) and 33% (Green)—to business operations from 2018 to 2023.. (ECF No. 114 at 27). They also are both involved in making decisions about promoting high-level managers and general managers at the store level. (ECF No. 106-3 at 66-69; 70; 75). Moreover, Lloyd began serving as the human resources consultant in 2023. (ECF No. 116 at 13).

On the other hand, Defendants argue that Loyd and Green did not hire, fire, discipline, set the schedules or job duties. (ECF No. 107). Contrary to Defendants' assertions, when viewing the evidence in the light most favorable to Plaintiffs, the record demonstrates at least a triable issue of fact as to whether Lloyd and Green exercised sufficient operational control to qualify as "employers" under the FLSA. *See, e.g*., *Solis v. Suroc, Inc*., 49 F. Supp. 3d 502, 511 (N.D. Ohio 2014) ("Both parties have presented evidence in support of their positions. The Court finds that there is, in fact, a genuine issue of material fact as to whether the Individual Defendants exercised sufficient control over the operational functions of the businesses to qualify as "employers" under the Act.").

Thus, Defendants are not entitled to summary judgment on the issue of individual liability of Defendants Scott Lloyd and Stephon Green.

### B. Collective Action Status

Defendants also move for decertification of the conditionally certified class. (ECF No. 107). The Defendants did not move for Summary Judgment on this issue. This Court previously granted the Motion for Conditional Certification and noted that "Defendants are not left without recourse by this Court's grant of conditional certification. If discovery reveals that the class

should be limited to a subset of the employees who work only at the same location that employed Plaintiff, the Court may address that issue on Defendants' motion to decertify the collective action at that time." (ECF No. 51 at 13). Now, Defendants argue that even if this action survives summary judgment, the collective action aspects of the case should be decertified because Defendants' policies do not show any basis for FLSA violations and the difference in their working situations precludes resolution through representative testimony.

The FLSA authorizes collective actions "by any one or more employees for and on behalf of himself or themselves and other employees similarly situated." 29 U.S.C. § 216(b). To participate in FLSA collective actions, "all plaintiffs must signal in writing their affirmative consent to participate in the action." *Comer v. Wal-Mart Stores, Inc.,* 454 F.3d 544, 546 (6th Cir. 2006). Only "similarly situated" persons may opt-in to such actions. *Id*. *See also Frye v. Baptist Memorial Hosp., Inc*., 495 Fed. Appx. 669, 671 (6th Cir. 2012) ("Plaintiffs seeking to file a collective action under the FLSA must demonstrate that they are 'similarly situated.' ") (quoting 29 U.S.C. § 216(b)).

When this Court granted the motion for conditional certification, it did so within the well-established two-step framework courts employ to determine whether an action may proceed as a collective under the FLSA. The first step, conditional certification, takes place at the beginning of discovery and requires a plaintiff to "make a modest factual showing" that employees are "'similarly situated' for purposes of the statute's requirements." *Comer*, 454 F.3d at 546-47 (quoting *Pritchard v. Dent Wizard Int'l Corp.,* 210 F.R.D. 591, 594-95 (S.D.Ohio 2002)). This is a "fairly lenient standard, and typically results in conditional certification of a representative class." *Id*. at 547 (quoting *Morisky v. Public Serv. Elec. & Gas Co.,* 111 F.Supp.2d 493, 497 (D.N.J.2000)). This first step is a "notice determination" as it allows the court to  facilitate notice

40

of an FLSA suit to other employees. *Clark v. A&L Homecare & Training Ctr., LLC*, 68 F.4th 1003, 1008-09 (6th Cir. 2023). The second step takes place after discovery and requires courts to apply a stricter standard to determine whether the other employees are in fact similarly situated. *Comer*, 454 F.3d at 546. In *Clark*, however, the Sixth Circuit "made clear that 'the term certification' has no place in FLSA actions*." McElwee v. Bryan Cowdery, Inc*., No. 2:21-cv-1265, 2023 WL 4423880, at *11 (S.D. Ohio July 10, 2023) (quoting *Clark*, 68 F.4th at 1009).

Although the Sixth Circuit in Clark clarified that "certification" is a misnomer in the FLSA context, the Court nonetheless retained the two-step framework for issuing notice and allowing FLSA claims to proceed as a collective action. *Id*.; *McCall v. Soft-Lite L.L.C*., No. 5:22-cv-816, 2023 WL 4904023, at *4 (N.D. Ohio Aug. 1, 2023).

Step one still requires that the "Court make[ ] an initial determination on whether the named plaintiffs are similarly situated to other, potential opt-in plaintiffs." *McElwee*, 2023 WL 4423880, at *11. Instead of the lenient "modest factual showing," that plaintiff is "similarly situated" to other employees, the plaintiffs must show a "strong likelihood" that they are similarly situated. *Polen v. JSW Steel USA Ohio, Inc*., 699 F. Supp. 3d 622, 627 (S.D. Ohio 2023). This notice determination "has zero effect on the character of the underlying suit." *Clark*, 68 F.4th at 1009.

Step two still arises after discovery and requires that the Court make a conclusive determination on whether the named plaintiffs have shown, by a preponderance of evidence, that they are in fact similarly situated' to opt-in plaintiffs. *Polen*, 699 F. Supp. 3d at 628.

Despite the holding in *Clark*, Defendants urge this court to "decertify" the class because of the varying factual employment experiences. (ECF No. 107-1 at 33). This includes different experiences with the posters that allegedly provided sufficient notice, the type of work performed

at the tipped rate, and the extent that work was performed. Defendants also argue that adjudication will involve extensive individualization of proof. This is particularly true based on Plaintiffs' side work claims—claims based on related and unrelated non-tipped work—which would hinge on the specific employee's hours of work. Defendants finally argue that adjudicating Plaintiffs' claims on a collective basis would be unfair and prejudicial to all parties. To support this assertion, Defendants emphasize that the only way parties can argue Plaintiffs' claims is by tediously picking the collective action apart, person by person, in a manner that is both inefficient and prejudicial. *Johnson v. Big Lots Stores, Inc*., 561 F. Supp. 2d 567, 586 (E.D. La. 2008) (holding that when a defendant must "pick the class apart, plaintiff by plaintiff, going into the day-to-day job duties of each" it "is the antithesis of a collective action").

Plaintiffs, on the other hand, argue that the record establishes that there is at least a genuine issue of material fact that Plaintiffs are similarly situated. (ECF No. 114 at 33). Plaintiffs' briefing did not advance further substantive arguments demonstrating that they are similarly situated. During oral argument, Plaintiffs asserted that Defendants admit that this case involves similar policies regarding compensation and side work issues (ECF No. 107-1 at 14), similar checklists for servers (*Id*. at 15), the same notification form, (*Id*. at 17) and similar POS systems offering minimum wage or subminimum wage categories (*Id*. at 27).

Although *Clark* disposed of the term "certification" in the FLSA context, the pending motion to decertify "presents this Court with the appropriate vehicle to conduct the second step of the *Clark* analysis for determining whether this case may proceed as a collective action." *McCall*, 2023 WL 4904023, at *4 (applying the second step of the *Clark* analysis in response to the defendant's motion to decertify FLSA class); *McElwee*, 2023 WL 4423880, at *10-*12 (same); *Miller v. SBK Delivery, LLC*, No. 2:21-CV-4744, 2024 WL 862195, at *1 (S.D.

42

Ohio Feb. 29, 2024) (notifying parties that there was no collective to "decertify" pursuant to *Clark* and allowing parties to brief whether the opt-in plaintiffs were similarly situated).

As such, this Court may determine conclusively whether named Plaintiff has shown, by a preponderance of evidence, that she is in fact similarly situated to opt-in Plaintiffs. It is important to note that the new two-step process to determine whether an action should proceed as a collective does not impact the traditional meaning of "similarly situated." *Polen*, 699 F. Supp. 3d at 627. The FLSA does not define "similarly situated," but the Sixth Circuit has tacitly approved three factors to consider: (1) employment settings, (2) individualized defenses, and (3) the fairness and procedural impact. *Frye*, 495 F. App'x at 671-72 (citing *O'Brien v. Ed Donnelly Enterprises, Inc.,* 575 F.3d 567, 584 (6th Cir.2009)). None of these factors alone is determinative. *Polen*, 699 F. Supp. 3d at 628. The inquiry to determine whether individuals are similarly situated assesses "whether the merits of other-employee claims would be similar to the merits of the original plaintiffs' claims—so that collective litigation would yield 'efficient resolution in one proceeding of common issues of law and fact arising from the same alleged discriminatory activity.'" *Clark*, at 1012, (quoting *Hoffmann-La Roche Inc. v. Sperling*, 493 U.S. 165, 170 (1989)).

Here, the Named Plaintiff and the opt-in's Plaintiffs' raise claims that involve common questions of law and fact, including whether Defendants maintained an FLSA-violating policy with respect to tip credit notice requirements and the assignment of non-tipped duties to tipped employees. Each Plaintiff was subject to the same timekeeping system, the POS system, which required them to clock in under specific job classifications associated with different wage rates.

Moreover, Plaintiffs' duties were consistent across locations, as servers were expected to complete similar opening, shift-change, and closing tasks at each restaurant. Defendants also

acknowledged posting the same or substantially similar notices regarding the tip credit at all restaurant locations.

To be sure, some factual distinctions exist. This includes whether individual employees report seeing the tip-credit posters or being told tip-credit information. Another distinction exists with respect to the type of non-tipped work performed, and the amount of time spent performing it. (ECF No. 107-1 at 34).

Nevertheless, named plaintiffs are required to show that their position is "similar, not identical" to the position of the opt-ins. *Lewis v. Huntington Nat'l Bank*, 789 F. Supp. 2d 863, 867 (S.D. Ohio 2011) (citations omitted). Opt-ins "are those whose causes of action accrued in approximately the same manner as those of the named plaintiff." *Id.*; *see also Polen*, 699 F. Supp. at 630 (S.D. Ohio 2023) (quoting *McElwee*, 2023 WL 4423880, at *12) ("[P]laintiffs are similarly situated to one another if their claims are "unified by common theories of defendants' statutory violations, even if the proofs of these theories are inevitably individualized and distinct." ).

Defendants' argument that they have individualized defenses to Plaintiff's and the opt-in Plaintiffs' claims likewise does not prevent this case from proceeding as a collective action. Defendants express concern about the purportedly individualized nature of the claims in this case and assert that the "defenses cannot be addressed on a collective action basis, or with representative proof." (ECF No. 106 at 36). Sixth Circuit precedent, however, is clear that "individualized defenses alone do not warrant decertification [of a plaintiff class in an FLSA collective action] where sufficient common issues or job traits otherwise permit collective litigation." *Monroe v. FTS USA, LLC*, 860 F.3d 389, 404 (6th Cir. 2017).

Accordingly, because the claims arise from common policies and are unified by shared legal theories despite some factual differences, the Court finds that Plaintiffs have demonstrated,

by a preponderance of the evidence, that they are similarly situated. This case may proceed as a collective action.

## III. CONCLUSION

For the reasons stated above, this Court hereby finds that Plaintiffs' Motion for Partial Summary Judgment (ECF No. 108) is **GRANTED in part and DENIED in part**. The motion is granted as to liability on Plaintiffs' dual jobs claim.

Defendants' Motion for Leave to File Excess Pages (ECF No. 104) is **GRANTED** and Defendants' Motion for Summary Judgment (ECF No. 107) is **GRANTED in part and DENIED in part**. Specifically, the motion is granted as to: (1) any claim that Plaintiffs were not paid appropriately for work performed during their opening shifts; and (2) notice-related claims after November 2021 for Plaintiffs who signed the notification form, starting on the date the form was signed. Defendants' duplicative motion for summary judgment (ECF No. 105) is **DENIED AS MOOT**.

Further, Defendants' Motion for Decertification of Collective Action (ECF No. 107) is **DENIED**.

**IT IS SO ORDERED.**

**ALGENON L. MARBLEY**
**UNITED STATES DISTRICT JUDGE**

**DATED: September 2, 2025**