IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| KAYLA PENDER, *individually and on behalf of all others similarly situated*, | : | |
| | : | |
| | : | |
| Plaintiffs, | : | |
| | : | Case No: 2:21-cv-04292 |
| v. | : | |
| | : | Judge Algenon L. Marbley |
| FLYING S. WINGS, INC. *et al.*, | : | Magistrate Judge Kimberly A. Jolson |
| *d/b/a* Buffalo Wild Wings, | : | |
| | : | |
| Defendants. | : | |

**Final Judgment**

Plaintiff Kayla Pender ("Pender"), on behalf of herself and all others similarly situated, brought suit against Defendants Flying S. Wings, Inc., Flying Buffalo Inc., Chase & Green Corp., Scott Lloyd, and Stephon Green ("Defendants"), alleging violations of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201, et seq., and the Ohio Minimum Fair Wage Standards Act, O.R.C. §§ 4111.02 et seq. (ECF No. 42). On February 17, 2026, this Court began a three-day bench trial to resolve the remaining issues. Based on the findings of fact and conclusions of law stated below, this Court finds in favor of the Plaintiffs. This Court finds no liability, however, on behalf of the Individual Defendants, Scott Lloyd and Stephon Green.

## I.  PROCEDURAL HISTORY

Plaintiffs filed the initial Complaint on August 31, 2021, seeking to resolve a FLSA dispute regarding overtime and minimum wage claims between employee Kayla Pender, on behalf of herself and all others similarly situated, and her former employer Flying S. Wings, Inc. d/b/a Buffalo Wild Wings. (ECF No. 1). Plaintiffs also named Scott Lloyd and Stefon Green, two owners

1

of the named corporations, as individual Defendants. Plaintiffs then filed an Amended Complaint on November 4, 2021, and a Second Amended Complaint on June 15, 2022. (ECF Nos. 10, 42).

The claims here arise from Defendants' alleged practice of paying their employee servers and bartenders subminimum hourly wages under the tip-credit provisions of the FLSA which also violates the Ohio Constitution and the Ohio Wage Act. (ECF No. 42 at 2–3). The relevant time period of the claims asserted here begins on August 31, 2018, three years prior to the Plaintiffs filing their initial Complaint, and concludes in November 2021, when the Defendants began using a tip credit acknowledgment form.[1]

On March 13, 2023, this Court granted Pender's Motion to Certify Class. (ECF No. 51). Subsequently, on November 18, 2024, Defendant filed a Motion for Summary Judgment and Decertification of Collective Action. (ECF No. 107). Pender then filed a Partial Motion for Summary Judgment. (ECF No. 108). In resolving those motions, this Court found that there were genuine issues of material fact as to whether the Defendants provided adequate notice to the employees of the Defendants' intent to use the tip-credit. Specifically, this Court opined that there were unresolved questions as to: (1) whether the posters were provided at each location over the relevant time of this case; and (2) whether those who saw the posters or were told to review the posters were informed orally, or in some other form, of the employer's intent to use any tax credit for that employee's pay. (ECF No. 122 at 17). Accordingly, this Court denied both parties motions for summary judgment on those issues. (*Id.*).

This Court also denied summary judgment as to whether the Plaintiffs were paid adequately for non-tipped work related to tipped work and for expo work regularly performed by servers. This

---

[1] Plaintiffs contend that the relevant time period extends to 2022. This Court noted in its summary judgment Opinion & Order, however, that if any Plaintiff signed the tip credit acknowledgment form implemented by Defendants following this lawsuit, their notice claims end on the date they signed the form. (See ECF No. 122 at 14–15).

Court granted the motion in favor of Plaintiffs as to non-tipped work for the janitorial and maintenance-related duties performed during shift change and closing. (*Id.* at 24, 31, 36). Additionally, this Court granted Defendants' motion for summary judgment as to: (1) any claim that Plaintiffs were not paid appropriately for work performed during their opening shifts; and (2) notice-related claims after November 2021 for Plaintiffs who signed the notification form, starting on the date the form was signed. (ECF No. 122 at 45). Finally, this Court denied Defendants' motion to decertify the collective action, reasoning that all the claims arise from common policies and are unified by shared legal theories demonstrating the Plaintiffs are similarly situated. (*Id.* at 44). This case was then scheduled for a bench trial.

The Parties jointly filed a proposed pretrial order confirming that the remaining issues of fact:

- Whether Defendants failed to give Plaintiffs notice of the tip credit provisions as required by the FLSA;
- Whether Defendants required Plaintiffs to incur unreimbursed business expenses and whether such expenses caused Plaintiffs' to fall below the minimum in an pay period;
- Whether Defendants paid Plaintiffs subminimum hourly wages to perform nontipped work unrelated to Plaintiffs' tipped occupation;
- Whether Defendants paid Plaintiffs subminimum hourly wages to perform nontipped work that, although related to Plaintiffs' tipped occupation, exceeded twenty percent (20%) of their time worked during each workweek; and
- Whether Defendants Scott Lloyd and Stephon Green qualify as "employers" under the FLSA and Ohio Wage Act.
- Whether Plaintiffs may prevail upon their claims when they chose not to clock in under the classification whereby they would have received the full minimum wage rather than the tip rate, such as when performing "outs" and "closing" side work.
- Whether Defendants acted in good faith by creating and implementing timekeeping and payroll policies and procedures, including relating to the tip credit and any tip pool, to properly compensate Plaintiff and all similarly situated employees for all hours worked, and Defendants had reasonable grounds to believe that their alleged act or omission, if any, was not a violation of the FLSA, thereby precluding an award of liquidated damages or a finding of a willful violation of the FLSA.
- Whether Plaintiffs cannot establish a willful violation of the FLSA, and therefore cannot recover beyond the two-year statute of limitations period under the FLSA, 29 U.S.C. § 255(a) and the Ohio Wage Act.

(ECF No. 169 at 10–11).

At trial, Plaintiffs called Kayla Pender, Sara Bishop, and Chris Beltran. Scott Lloyd and Stephon Green were also called to testify as witnesses for both Plaintiffs and the Defendants.

## II.  FINDINGS OF FACT

### A.  The Parties

During the relevant time period, Defendants Flying S. Wings, Inc., Defendant Flying Buffalo, Inc., and Defendant Chase & Green Corp. (collectively "the Corporate Defendants") owned the four Buffalo Wild Wings restaurants at issue in this matter. Flying S. Wings, Inc. operated the St. Clairsville restaurant location; Flying Buffalo, Inc., operated the Moundsville, West Virginia and Parkersburg, West Virgina restaurant locations; and Chase & Green Corporation operated the Barboursville, West Virgina location. Defendants Scott Lloyd and Stephon Green are co-owners of Defendants, Flying S Wings, Inc., and  Flying Buffalo, Inc. Defendant Stephon Green is also the majority owner of Defendant Chase & Green Corp. All of the Corporate Defendants maintain their principal place of business in St. Clairsville, Ohio, with Defendant, Stephon Green listed as the registered agent.

Plaintiff Kayla Pender was employed as a server by Defendant Flying S. Wings at the St. Clairsville Buffalo Wild Wings restaurant from October 2019 until June 2021. Plaintiff Sara Bishop also worked as a bartender at the St. Clairsville location from July 2019 to May 2021. Defendants also employed a number of other servers and bartenders to maintain these four restaurants. This Court has determined that the testimony of Plaintiffs Pender and Bishop is representative of all Opt-In Plaintiffs.

## B. Notice of the Tip Credit

### 1. Oral Notice

During the relevant time period, the restaurants maintained an unwritten policy that employees were to be informed by managers during the orientation process about their rate of pay, that they would earn tips, that if they did not earn enough tips to satisfy minimum wage, their tips would be supplemented, and that they could keep 100% of the tips earned. Tr. 338–340. Regional Manager, Chris Beltran, was responsible for training managers at all four locations on this policy. *Id.* Beltran observed multiple managers, including Ben Omaits, onboarding new servers and following restaurant policy by explaining that tipped employees could keep their tips and that if they did not earn enough tips to satisfy minimum wage their tips would be supplemented. Tr. 340:6–15. Beltran, however, was not present for the hiring or training of Kayla Pender or Sara Bishop. Tr. 318–319.

Kayla Pender was interviewed and onboarded by Ben Omaits. Tr. 24:3-8; 26:19–23. During her interview, Omaits informed Pender she would receive tips. Tr. 149:17–23. Despite the policy that managers were to orally inform employees of the tip credit, Pender was never informed of the tip credit during her interview or orientation. Tr. 24:23–25; 25:1–25; 26:1. At no time during her employment did Buffalo Wild Wings explain the tip credit to Pender. Tr. 30:5–12. Specifically, no one explained that she was to retain all of her tips, that the restaurant intended to take a tip credit, the specific dollar amount of the tip credit they intended to take, or that the tip credit would not apply unless she was informed of the provisions. Tr. 30:5–25. Pender was trained not by a manager but by another server who did not explain the tip credit. During her employment, Pender later trained several employees herself, to whom she did not explain the tip credit. Tr 32:1–25; 33:1–3.

Sara Bishop initially interviewed for employment at the St. Clairsville restaurant with a manager named Brandy. 277:20–23. During Bishop's interview, she was told about her position, her pay, that her pay would be a subminimum wage, and that she would also be earning tips. Tr. 278:1–10. Bishop, however, never had the tip credit explained to her during her employment at Buffalo Wild Wings, nor did anyone tell her the specific dollar amount of tip credit they intended to take, that all of her tips were to be retained by herself, or that the tip credit would not apply unless she was informed of the tip credit provisions. Tr. 226:12–25; 227:1–25; 228:1–8.

### 2.    Employee Handbook Notice

During the relevant time period, the Defendants also relied on the employee handbook as a form of tip credit notice. The employee handbook that was in effect at all four restaurants contained a section titled "Tipped Employees." Tr. 321:14–24. The section provided that "[e]mployees who receive tip income will be provided a written policy statement regarding any applicable policy on mandatory tip pooling or use of the tip credit to satisfy the minimum wage obligation." Tr. 321:25–322:1–5; Jt. Ex. 42. Kayla Pender attested that she never received a written policy explaining the tip credit at any point during her employment. Tr 29:1-25; 30:1–4. Similarly, Plaintiff Sara Bishop testified that she was never given a form to read and sign explaining the tip credit. Tr. 228:5–8. There is no evidence that such written policy existed until November 2021, after this lawsuit was filed. Tr. 322:14–17. Chris Beltran testified that the restaurants made changes to their policies following this lawsuit which required tipped employees to sign a written acknowledgment regarding the tip credit. Tr. 320:1–16. By Mr. Beltran's own admission, the restaurants were not following the policy provided in the handbook that required written notice until after this lawsuit. Tr. 322:6–17.

### 3.    Poster Notice

During the relevant time period, Defendants also displayed Department of Labor posters in the back of all four restaurants that reflected the relevant federal and state laws, and specifically discussed the tip credit, where employees could see them. Tr. 340:16–25; 341–347; D. Ex. 8; 89. The restaurants maintained a policy in which managers were supposed to show new employees the posters and explain that they were there for their convenience. Tr. 347:16–23. Plaintiff Pender recalled seeing the poster in the St. Clairsville restaurant, but never read the poster, and only recalled the poster said "the law" at the top. Tr. 31:4–22. The West Virginia poster indicated that employers are allowed to choose to claim a tip credit and if so, what the law requires. D. Ex. 89. Similarly, the Ohio poster defined tipped employees and explained what employers must do when electing to use the tip credit. D. Ex. 8. Neither poster represented that the Defendant restaurants intended to use the tip credit.

### C.  Inappropriate Business Expenses

Defendants maintained a dress code policy that included a uniform shirt, dark pants or jeans, and nonslip shoes. Tr. 33:4–17. Employees were provided with two free uniform shirts, and if an employee wanted additional shirts, they could pay for the additional shirts out of pocket. Tr. 33:11–25; 34:1–4. Defendants did not deduct the cost of any uniform shirts, nonslip shoes, or dark pants from Plaintiffs' paychecks. Tr. 365:22–25; 366:1–2. Defendants also provided Plaintiffs with aprons, name tags, and server books. Tr. 167:17–25; 168:1–9. Pender never had to pay for a walkout, a shortage, a mistaken order, or breakage. Tr. 169:1–12.

### D.  The POS System and Job Codes

All employee hours were tracked at the restaurants using the Point of Sale ("POS") system. Tr. 53:9–13. Employees were to clock in and out using the POS system every shift to

track all hours worked. *Id.* When clocking into the POS system, the employee was required to select a job code, such as "meeting," "server," or "bartender." Tr. 53:16–25; 54:1–4. The different job code options reflected different hourly wages dependent on the wage code entered. Tr. 54:5–14. When employees clocked in under the meeting job code, they were paid full minimum wage, but, when they clocked in under the server or bartender codes, they received the subminimum wage rate. *Id.*

The restaurants maintained an unwritten policy that employees were to clock into the meeting code when performing opening or closing duties, "outs,"[2] and other side work. Tr. 236:7–22; 326:25; 327:1–10; 329:11–14. At the start of a shift, an employee could independently clock into the meeting code to complete their opening duties. Tr. 55:21–25; 56:1–2. Further, when switching from meeting to server, an employee could also do so without assistance. To switch to the meeting code at the end of the shift before performing outs or closing duties, however, employees needed assistance from a manager. Tr. 85: 12–14, 24–25; 86:1–7. An employee could not independently shift to the meeting code once clocked in under the server code. Tr. 275:9–18. Additionally, an employee could not independently switch to the meeting code if performing side work mid shift. Tr.118:24–25; 119:1–20.

The evidence presented at trial demonstrates that the employees were trained on the job code policy inconsistently. While some employees like Plaintiff Bishop received training on this unwritten policy, others like Plaintiff Pender had to be corrected on the job because she did not receive training on when to select a particular job code initially. Tr. 54:15–25; 236:7–22. Bishop was also trained that for any side work that took more than 20 minutes, she could clock in under the meeting code for the duration of that task. Tr. 284:2–6. Notably, however, the evidence

---

[2] "Outs" consisted of stocking the server station, taking out trash, sweeping serving sections, cleaning tables and chairs, and any other duties to be completed before completing a shift. Tr. 78:22–25; 79–81.

presented at trial does not support that this unwritten policy was reinforced by managers or followed consistently. For example, management observed servers washing dishes, taking out trash, and performing other side work tasks while they were supposed to be serving tables, yet did not inquire about the code under which the work was being completed. Tr. 198:22–25; 199:1–2; 305:5–25; 306:1–9. Further, Pender was never disciplined for performing these side tasks under the server code. Tr. 55:3–5.

Despite maintaining an unwritten policy on job codes, this policy was not enforced in practice. Oftentimes managers did not assist servers with the clock out process, and as a result, the employees performed outs, closing duties, and other side work under the server, subminimum wage code. Tr. 85:4–23. At times, employees waited for up to forty-five minutes before a manager would help them switch to the meeting code to perform outs and closing duties. *Id.*; 87:6–24; 274– 275. As a result, the Plaintiffs frequently completed these tasks under the server job code. Tr. 85:4– 9.

Defendants also maintained a policy that allowed employees to edit POS system time entries to correct clock in time or job codes. Under this policy, employees could adjust the code for work performed under the server code to the meeting code by submitting a form. Tr. 357:21– 25; 358:1–25; 359:1–9; Jt. Ex. 150.

### E. Side Work

#### 1. Outs

After each opening shift, servers were required to complete their "outs" before leaving for the day. Tr. 80:17–20. Outs consisted of section specific tasks listed on a checklist such as sweeping the floor, cleaning tables, cleaning the garbage can, cleaning the sink, cleaning tea urns, filling ice, wiping the cupboards, and stocking the server station with condiments, napkins, and

wet wipes. Tr. 78:22-25; 79:1–4; 83:2–13; 89–92. Specifically, Pender estimated cleaning the garbage can took between five to ten minutes, filling ice took between five to six minutes, taking out trash took between three to five minutes, sweeping the floor of a serving section could take between five to ten minutes, cleaning the sink took about three minutes, cleaning tea urns took between five to ten minutes, and wiping cupboards took about three to five minutes. *See generally* Tr. 89–95. On average, Pender completed her outs in thirty to forty-five minutes when working in main dining. Tr. 87:9–14. She additionally estimated that about eighty percent of the time, she completed her outs under the server code due to the length of time it typically took for a manager to help her switch to the meeting code. Tr. 85:4–23.

### 2. Rolling Silverware

Pender also testified that servers frequently rolled silverware throughout their shifts. Tr. 104:24–25; 105:1–12. Servers would roll anywhere between five to twenty silverware sets at a time and repeated the process five to ten times a shift. Tr. 105:14–25; 106:1–12. Post-COVID, the process took up slightly less time. Tr. 195:2-9.

### 3. Closing Duties

After each closing shift, servers were expected to complete closing duties. Pender estimated these duties took on average an hour to an hour and a half. Tr. 112:18–22. Typically, Pender would start her closing duties an hour before the end of her shift depending on how busy the restaurant was. Tr. 113:5–12. Closing servers were expected to mop floors and double-check everything. Tr. 111:21-25; 112:1–3. Closing servers were also expected to answer the phones for takeout orders and restock the server stations. Tr. 114: 4–15. Pender attested that about forty percent of her shifts were closing shifts and a majority of the time she performed these tasks under the server job code. Tr. 112:8–17.

### 4.   Shift Change Duties

At the start of a midday shift, servers were expected to complete shift change duties which consisted of stocking the server station, making tea, preparing lemons and limes, sweeping sections, cleaning tables, running food, and running dishes to the back. Tr. 132:3–25. Servers mostly performed these tasks under the server code. Often at the start of a midday shift, servers were immediately given tables and thus needed to begin serving and completing shift change duties simultaneously. Tr. 134:1–25; 135:1–4. Shift change duties typically took twenty to thirty minutes. Tr. 136:3–7.

### 5.   Expo Work

Often servers were also expected to complete expo work. Expo work entailed checking orders, placing the food on trays, and then setting the tray in the expedite window so a server could pick up the order and deliver it to the appropriate table. Tr. 117:11–22. Typically, there was one expo person per shift. Post-COVID, however, there were not enough expos to cover all shifts. Tr. 117:19–25; 118:1–3. As a result, servers would cover the expo role while actively serving tables. Pender estimated that during two out of her four or five shifts per week there was not an expo person working. Tr. 118:4–13. Thus, when acting as an expo during her server shifts, Pender was typically clocked in under the server job code. Tr. 119:3–5. During these shifts where no expo was staffed, Pender acted as an expo whenever she was not at a table or doing a side job. Tr. 118:14–17.

### 6.   Dishwashing

Servers were also expected to do dishwasher duties throughout the entirety of their shifts. Tr. 119:14-16. Post-COVID, the dishwasher position was not staffed and servers frequently picked up the slack. Tr. 144:1–3; 145:7–18; 262:1–3. Pender recalls that Ben Omaits directed servers to

11

assist with dishes any time they were in the back kitchen. Tr. 145:14-25; 146:1–4. Mr. Beltran affirmed that due to the lack of dishwashers, servers were responsible for cleaning the dishes. Tr. 331:3–5; 332: 14–17. Due to performing dishwashing duties while actively assigned tables, servers completed these duties under the server job code. Tr. 146:5–7. Pender further recalled that she and the other servers spent nearly as much time in the back of the house washing dishes as they were out front serving tables. She estimates that roughly forty percent of a given shift consisted of dishwashing. Tr. 146:8–25. Bishop recounted that washing dishes could take up a quarter of her time during any given shift, or longer if the restaurant was busy. Tr. 263:17-25; 264:1-25; 265:4–25; 266:1–13.

### 7.  Janitorial Work

During any closing shift, servers were expected to clean bathrooms. Tr. 136:8–15; 271:2–4. This usually occurred once all customers were out of the store and consisted of mopping and wiping down surfaces. Tr. 137:2–21. Pender estimated cleaning the bathroom took her about five to ten minutes, and she was occasionally clocked in under server, but mostly under the meeting job code. Tr.137:2–11. The restaurant did not employ janitors. Tr. 137:22–25; 138:1–3.

### F.  Individual Defendants

Both Defendants Scott Lloyd and Stephon Green had ownership interests in the restaurants at issue—Lloyd with two, and Green with all four establishments. Tr. 402:2–14; 499:10–25; 500:1–6. They also were both involved in making decisions about promoting high-level managers such as regional managers at the store level. Tr. 431–433; 507:22–24. As for general managers, Lloyd and Green delegated the authority to interview and hire general managers to Chris Beltran, although Beltran would occasionally discuss such decisions with Green. Tr. 506:17–25; 507:1–24.

12

Green attests that he did not promote any general managers himself between 2018 and 2022. Tr. 507:16–21.

Both Green and Lloyd had access to the corporate credit card and had oversight into purchases. Tr. 433:6–20. Additionally, Lloyd began serving as a human resources consultant for the St. Clairsville restaurant in 2023. Tr. 452:9–14. Green, however, acted as the "control person" or liaison between corporate and the franchise for the St. Clairsville, Moundsville, and Parkersburg locations. Tr. 419:14–25. As the control person, Green promoted regional managers, ensured managers attended trainings, set menu pricing, attended annual franchise conferences, and was involved in marketing. Tr. 517:21–25; 518:1–8. Lloyd and Green did not interview, hire, train, fire, discipline, make personnel decisions, set the schedules, wages, or job duties for servers and bartenders. Tr. 484–486; 531–532.

### III.  CONCLUSIONS OF LAW

#### A.  Tip Credit Notice

Under the FLSA, employers may receive a tip credit allowing them to pay tipped employees less than the federal minimum wage so long as the wage paid, when combined with the tips earned by the employee, meets or exceeds the  federal minimum wage. *Morse V. Fifty West Brewing Company LLC*, 2026 WL 872495, at *10 (S.D. Ohio Mar. 30, 2026) (citing 29 U.S.C. 203(m)(2)(A)). Importantly, an employer is required to inform an employee of the FLSA requirements prior to paying her pursuant to such provisions. 29 U.S.C. 203(m)(2)(A); *see also Waters v. Pizza to You, LLC*, 538 F. Supp. 3d 785, 795 (S.D. Ohio Feb. 9, 2021) ("The Fair Labor Standards Act's remedial goals are defeated if employees have no way of knowing whether they are being paid properly."); *Crowell v. M St. Ent., LLC*, 670 F. Supp. 3d 563, 592 (M.D. Tenn. 2023) (reasoning that failure to notify employees of the FLSA tip credit provisions triggers a minimum

wage violation and results in forfeiture of the tip credit.). In 2011, the Department of Labor issued regulation, 29 C.F.R. § 531.59(b), requiring employees to be informed of the following:

> (1) the amount of the employee's cash wage, (2) the amount of the tip credit claimed by the employer, (3) that the amount claimed may not exceed the value of the tips actually received, (4) that all tips received must be retained by the employee, except that "the pooling of tips among employees who customarily and regularly receive tips" is permitted, and (5) that the tip credit shall not apply to any employee who has not been informed of all of these requirements.

*Crowell*, 670 F. Supp. 3d at 581 (citing 29 U.S.C. § 203(m)(2); 29 C.F.R. § 531.59(b)). Notably, however, while other courts have deferred to § 531.59(b), the Sixth Circuit has not yet considered these specific requirements. *Id.* (citing *Galleher v. Artisanal, LLC*, 2021 WL 243868, at *6 (W.D.N.C. Jan. 25, 2021); *Driver v. AppleIllinois, LLC*, 917 F. Supp. 2d 793, 801–02 (N.D. Ill. 2013); *Nat'l Rest. Ass'n v. Solis*, 870 F. Supp. 2d 42, 54 (D.D.C. 2012)). The Sixth Circuit has held that at a minimum, the employer must ensure the employee is "informed" that the employer "intends to treat tips as satisfying part of the employer's minimum wage obligation" but need not "explain" the tip credit. *Kilgore v. Outback Steakhouse of Fla., Inc.*, 160 F.3d 294, 298 (6th Cir. 1998); *Solis v. Min Fang Yang*, 345 F. App'x 35, 38 (6th Cir. 2009); *McFarlin v. Word Enters.*, 2018 WL 1410827, at *2 (E.D. Mich. Mar. 21, 2018). This Court finds that regardless of whether Defendants' actions are evaluated under § 531.59(b), or the Sixth Circuit's standards espoused in *Kilgore*, Defendants have failed to provide notice of the tip credit in compliance with the FLSA.

Here, Defendants contend that during the relevant time period employees were provided notice that Defendants intended to treat tips as a satisfying component of the minimum wage requirement via: (1) oral notice; (2) written notice in the employee handbook; and (3) posters displayed on site. (ECF No. 189 at 28–29). Additionally, Defendants argue that in November 2021, Defendants began using a written tip credit form that provided notice in compliance with the FLSA from that point on. *Id.* at 27. In opposition, Plaintiffs argue that Defendants were required to inform

employees of the five requirements listed by the Department of Labor in 29 C.F.R. § 531.59(b) yet failed to do so. (ECF No. 190 at 19).

First, looking to the five requirements of § 531.59(b), despite Chris Beltran testifying that the employees were informed of these requirements, there is no evidence that Defendants informed Pender or Bishop that the amount of a tip credit claimed may not exceed the value of the tips actually received, that they were to retain all tips themselves, or that that the tip credit shall not apply to any employee who has not been informed of all of these requirements. Further, Beltran admits that he was not present for the interviews or orientations of either Bishop or Pender. Accordingly, there is no evidence that the policy of informing employees of all the requirements in § 531.59(b) occurred in practice.

Next, this Court evaluates whether Defendants provided sufficient notice pursuant to the Sixth Circuit's standards. As discussed in this Court's summary judgment opinion on this matter, the posters and oral statements alone may be insufficient, although each may be relevant for providing adequate notice if provided along with other forms of notice. (ECF No. 122 at 18). Employers may inform employees of the tip credit orally, in writing, or through a combination of sources. *See Schaefer v. Walker Bros. Enters.*, 829 F.3d 551, 558 (7th Cir. 2016); *Pellon v. Bus. Representation Int'l, Inc.*, 528 F. Supp. 2d 1306, 1311–1312 (S.D. Fla. 2007), *aff'd,* 291 F. App'x 310 (11th Cir. 2008).

At trial, Defendants offered evidence confirming that Department of Labor posters were prominently displayed in each restaurant. Pender confirmed that she was aware of these posters yet admitted to never reading them and only knew they said "the law" at the top. Additionally, Chris Beltran testified that these posters were used to explain the tip credit and managers were trained to show these posters to new employees. As for the employee handbook notice, despite the

15

handbook containing a provision stating that "[e]mployees who receive tip income will be provided a written policy statement regarding any applicable policy on mandatory tip pooling or use of the tip credit to satisfy the minimum wage obligation," Defendants provided no evidence of any such written policy in existence before November 2021. Finally, Beltran also testified that he trained managers to inform new hires orally that as tipped employees, they could keep 100% of their tips, and that if they did not earn enough tips to satisfy minimum wage, their tips would be supplemented. While Bishop confirmed she was told about receiving a subminimum wage, and that she would get tips, Pender testified that the tip credit provisions were never explained to her.

In *Schaefer v. Walker Bros. Enterprises*, the employer provided a document notice stating "Tip Credit. I understand that a portion of the wages I receive are from tips. The Company can apply a credit to the minimum wage to include those tips as wages. The tip credit in Illinois is 40% of minimum wage." *Id.* at 557. The *Schaefer* court found that this handout in combination with DOL posters provided sufficient notice. *Id.* at 558. Similarly, in *Kilgore*, the employer provided a file to the plaintiff stating "I understand that the practice of sharing tips among tipped employees is approved by Outback Steakhouse. Further, I understand that tips will be used as a credit against the minimum wage as permitted by federal and/or state law." *Kilgore*, 160 F.3d at 299. The *Kilgore* court found that providing this provision to the plaintiff provided sufficient notice even where the employee denied being directed to read the provision. *Id.* at 299–300.

Here, the posters do not expressly indicate that Defendants intended to treat tips as satisfying part of their minimum wage obligations. The West Virginia poster indicated that employers are allowed to make a choice to claim a tip credit and if so, what the law requires. D. Ex. 89. Similarly, the Ohio poster defined tipped employees and explains what employers must do when electing to use the tip credit. D. Ex. 8. Neither poster, however, indicated that the employer intended to use

16

the tip credit. The posters alone are insufficient, as nothing indicated how these posters apply to Plaintiffs. Further, the handbook notice was nowhere near as specific as those offered in *Kilgore* and *Schaefer*. Most notably, Plaintiffs were never provided with a written acknowledgment form as promised in the handbook. Accordingly, Plaintiffs never signed an acknowledgment or received an individual handout like the plaintiffs in *Kilgore* and *Schaefer*. The information provided to Plaintiffs via the posters and the handbook were not offered in a decipherable context for an employee to understand that the employer intended to treat tips as satisfying part of the employer's minimum wage obligation.

In summary, neither the posters nor the employee handbook explicitly communicated Defendants' intent to use the tip credit, and there is not conclusive evidence that employees were told about the tip credit. Both Pender and Bishop confirmed that managers did not explain that Defendants intended to use tips to satisfy their minimum wage obligations and the FLSA. Accordingly, this Court finds that Defendants failed to provide sufficient notice of the tip credit prior to 2021. As mentioned in this Court's summary judgment opinion, however, Defendants began providing notice via written tip credit acknowledgment forms which were signed by employees. Accordingly, all employees who signed a tip credit notice form are not entitled to any damages for violations of the FLSA tip credit notice requirement.

### B. Side Work

#### 1. Unrelated Work

Plaintiffs additionally claim that they were paid a subminimum hourly wage in violation of FLSA while performing: (1) non-tipped work that is unrelated to their jobs as servers and bartenders; and (2) non-tipped work related to the tipped work that exceeded 20% of their time. (ECF No. 42 ¶ 91). Plaintiffs contend that the evidence adduced at trial demonstrated Plaintiffs

were often engaged in unrelated tasks such as dishwashing, cleaning bathrooms, and acting as an expo while serving or bartending. (ECF No. 190 at 24). Defendants, however, argue that Plaintiffs were paid adequately under both scenarios and any inconsistencies can be attributed to Plaintiffs' own non-compliance with Defendants' policies. (ECF No. 189 at 24–25).

As discussed in this Court's summary judgement opinion, the Dual Jobs Regulation requires the court to analyze whether an employee's untipped duties are "related" to their tipped occupation, as well as the frequency with which those duties are performed. *Harding*, 745 F. Supp. 3d at 588 (citing *Harrison v. Rockne's Inc.*, 274 F. Supp. 3d 706, 710 (N.D. Ohio 2017). Courts have found that unrelated duties consist of tasks such as dishwashing, operating the grill, cleaning bathrooms, acting as a hostess, taking out the trash, and operating the phones. *Id.* (citing *O'Neal v. Denn-Ohio*, 2020 WL 210801, at *8–9 (N.D. Ohio Jan. 14, 2020)).

In order to meet the burden of their side work claims, Plaintiffs must: (1) prove they have performed work for which they were improperly compensated; and (2) produce evidence showing the amount and extent of the work performed as a matter of "just and reasonable inference." *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687–688 (1946). As to how often these tasks were performed "[p]laintiffs are required to show 'more than de minimis claims based on seconds or minutes spent' performing unrelated tasks." *Harding*, 745 F. Supp. 3d at 588.

At trial Pender and Bishop testified that during shifts they were frequently expected to perform unrelated tasks such as dishwashing, sweeping, taking out trash, and acting as an expediter. Defendants do not dispute that Plaintiffs were frequently expected to perform these tasks. In fact, Plaintiffs produced evidence that post-COVID, the restaurants failed to staff dishwashers, so servers were the ones washing all the dishes and spent nearly as much time washing dishes as they did serving tables. Similarly, the expediter position was not staffed properly

18

and therefore servers spent a large amount of time in the expo role while simultaneously serving tables. Additionally, each shift, servers were expected to perform outs and closing duties which could take anywhere from thirty minutes to an hour and a half depending on the day. These outs and closing duties were listed on a checklist and servers were expected to complete them each day. Defendants offer no evidence to refute that Plaintiffs were frequently required to do this unrelated work. Accordingly, Plaintiffs have satisfied their burden of demonstrating that they performed tasks unrelated to serving.

While Defendants do not dispute that servers were expected to and did this unrelated work on a regular basis, Defendants assert that the restaurants maintained policies that compensated this work appropriately. Chris Beltran testified it was restaurant policy that when performing outs and closing duties servers were instructed to clock in under the meeting job code to ensure their work was compensated at minimum wage. Further, he testified that servers were instructed to use the meting code for any side work that was expected to take more than twenty minutes during their shifts. Plaintiff Bishop affirmed that she was aware of the twenty-minute side work policy. Further, both Pender and Bishop were aware that servers were to clock in under the meeting code at the start of a shift, when performing outs, shift change, and closing duties. In fact, at trial Plaintiffs testified that sometimes the servers did clock in under meeting when performing these unrelated tasks. Notably, however, this policy was not enforced or consistently workable. Given that servers were not able independently to switch their job code from server to meeting, servers were often left with no choice but to complete these tasks under the server code and receive a subminimum wage. It is not dispositive that sometimes Plaintiffs completed these unrelated tasks under the meeting code and received minimum wage. *See, e.g.*, *Harding*, 745 F. Supp. at 589 ("To be sure, the record also shows that at some, though not all, times Plaintiffs were paid the full minimum

19

wage for time spent performing unrelated work. … However, these instances of proper compensation do not excuse the periods where Plaintiffs were not fully compensated for purposes of Steak N Shake's liability under the FLSA."). This is especially true given the fact that servers, due to short staffing, were often dishwashing and acting as expediters while actively waiting on tables.

Defendants presented no evidence that management reinforced the importance of the meeting code or consistently facilitated Plaintiffs switching to the meeting code when necessary. Further, Defendants failed to refute the testimony of Plaintiffs that management was aware that Plaintiffs were frequently doing side work under the server code. Although case law supports that no FLSA violation has occurred when an employer establishes a "reasonable process" for an employee to report uncompensated work, Defendants process was not reasonable. *Cf. White v. Baptist Mem'l Health Care Corp.*, 699 F.3d 869, 876 (6th Cir. 2012) (finding no FLSA violation where Plaintiff had a reasonable process to report time spent performing work during her lunch break via an "exception log"). In *White v. Baptist Mem'l Health Care Corp.*, the plaintiff only complained of performing uncompensated work during lunch breaks, whereas here, the issue was far more pervasive throughout Plaintiffs' entire shifts. *Id.* Further, Plaintiffs could not carry out the time reporting process without the help of management who eighty percent of the time did not assist them in switching job codes. Even the fact that the restaurants had time correction sheets does not defeat Plaintiffs' claims. Plaintiffs demonstrated that on a daily basis they were expected to complete a large amount of unrelated side work. A system that requires Plaintiffs to keep track manually of how long they engaged in unrelated tasks and then fill out a correction form after each shift is neither workable nor reasonable. Accordingly, Defendants have failed to refute that their

policies ensured Plaintiffs received minimum wage for unrelated side work in practice. Plaintiffs sufficiently established that they were inappropriately compensated for unrelated work.

Finally, Plaintiffs must produce evidence showing that the amount and extent of the unrelated work performed equates to more than *de minimis* claims. As mentioned above, Plaintiffs testified that these unrelated tasks were performed each day during shifts, shift changes, and closing. These tasks were more than the occasional one off. Due to short staffing, servers and bartenders were expected to wash dishes and expedite food consistently while they were serving tables. Outs often took forty-five minutes, shift change duties averaged twenty to thirty minutes, closing duties could take up to an hour and a half, cleaning bathrooms could take five to ten minutes, and dishwashing and expo work was required throughout the shifts post-COVID. All these tasks demonstrate that there was continuous practice of Plaintiffs performing unrelated side work. This work amounted to more than seconds or minutes, but often times equated to hours during Plaintiffs' shifts satisfying the FLSA violation threshold. *See Harding*, 745 F. Supp. at 588–589 (finding more than *de minimis* claims where plaintiffs unrelated tasks were more than an "occasional request" but rather demonstrated a continuous practice of tasks that could take between fifteen minutes to an hour).

### 2.  Related/Tip-Supporting Work

Next, Plaintiffs needed to adduce evidence at trial demonstrating that Defendants paid Plaintiffs subminimum hourly wages to perform non-tipped work which, although related to Plaintiffs' tipped occupation, exceeded twenty percent (20%) of their time worked during each workweek. Defendants argue that Plaintiffs' side work claims must fail due to Plaintiffs' failure to differentiate between time spent on tipped work, related non-tipped work, and unrelated non-tipped work. This Court disagrees.

First, Defendants assert Plaintiffs may not prevail given their failure to distinguish between related non-tipped work, and unrelated non-tipped work. In *Harding v. Steak N Shake*, the court denied summary judgment on plaintiff's related tip supporting claims where plaintiffs provided only general estimates. 745 F. Supp. at 590. Specifically, one plaintiff testified that she spent 40-50% her shifts "doing things other than the serving duties" and another testified that she spent between 20-40% of her shift doing "side work." *Id.* The court reasoned that "[b]y using the terms 'things other than the serving duties' and 'side work' to describe these tasks, [p]laintiffs' testimony fails to differentiate between time they spent performing unrelated work (like working the grill or cleaning bathrooms) and time spent performing tip-supporting work (like rolling silverware or cleaning up spills)." *Id.* at 590–591. Thus, the court's holding was primarily focused on the fact that the *Harding* plaintiffs failed to provide estimates as to how long they performed these tasks with specificity, as opposed to general statements about the tip-supporting tasks combined. Additionally, the *Harding* court did not dispute that "cleaning and setting tables, making tea and coffee, rolling and stocking silverware, stocking and refilling condiments, cleaning booths and the dining area, stocking paper supplies and drinks, mopping spills, and cleaning the dining area" consisted of tip-supporting work. *Id.* at 590.

Unlike in *Harding*, Pender and Bishop's testimony provided time estimates for each task as outlined above as opposed to more generally stating that the servers spent twenty percent of their time on related but non-tip supporting duties. Further, it is not dispositive that Plaintiffs did not state that each task was tip supporting/related or unrelated. This Court is well equipped to make such determinations. As the *Harding* Court reasoned, tasks such as rolling and stocking silverware, making tea and cleaning the tea station, stocking and refilling condiments, cleaning booths and the dining area are all tip-supporting work, and Plaintiffs offered testimony regarding how long it took

22

them to complete such tasks. Thus, this Court disagrees that Plaintiffs have failed to differentiate between related/tip-supporting and unrelated side work.

Additionally, pursuant to *Anderson v. Mt. Clemens Pottery Co.*, after a plaintiff has met her burden, the burden shifts to the employer "to come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from the employee's evidence." 328 U.S. at 687–688. The Supreme Court reasoned that "the employer cannot be heard to complain that the damages lack the exactness and precision of measurement that would be possible had he kept records in accordance with the requirements…." *Id.* at 688. Accordingly, an employee "nonetheless satisfies her burden if she 'proves that [she] has in fact performed work for which [she] was improperly compensated and if [she] produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference." *Rafferty v. Denny's, Inc.*, 13 F.4th 1166, 1191 (11th Cir. 2021). If an employer fails to meet its burden, the plaintiff is entitled to damages even if the award is an estimation. *Id.*

Here, as discussed above, Plaintiffs have met their burden through providing detailed testimony regarding the related/tip-supporting side work duties they were expected to do and how often they were engaged in these duties. Looking at Pender's testimony of rolling silverware alone, she estimated she spent five to ten minutes rolling silverware at least five to ten times a shift. *See id.* (finding plaintiff produced sufficient evidence by testifying the related duties took twenty-five to thirty minutes each shift). As such, it is not dispositive that Plaintiffs have not adduced highly specific evidence regarding how much time was spent on their non-tipped related duties. *Id.* at 1192 (reasoning that the employee need not pinpoint when her related duties exceeded twenty percent of the hours she worked and opining that the employer must negate the inferences "that

23

she worked more than twenty percent of her time in related duties at least some of the time she was employed.").

Further, Defendants failed to produce convincing evidence that negated the reasonable inference from Plaintiffs' testimony that they spent more than twenty percent of their time on related duties. Defendants' entire defense hinges on the fact that Plaintiffs failed to follow the job code policies implemented by the restaurants. Notably, however, Defendants failed to refute Plaintiffs' testimony that their policies were not carried out or workable in practice. Thus, the time records produced by Plaintiffs can be relied on as accurate representations of Plaintiffs' time spent on subminimum wage versus minimum wage tasks. Accordingly, it is reasonable for this Court to award Plaintiffs damages based on estimations for both their related and unrelated non-tipped duties.

### C. Inappropriate Expenses

Plaintiffs also allege that they were required to pay for uniforms, shirts, server books, walked tabs, copies of payroll documents, and other items and expenses in connection with performing their jobs for Defendants. (ECF No. 42 ¶¶ 60, 95). Plaintiffs assert that this invalidates the Defendants' claim to a tip credit under the FLSA because: (1) if these expenses were paid out of Plaintiffs' subminimum hourly wage, then their wages fell below the minimum required under the FLSA; or (2) if paid from their tips, then Plaintiffs did not retain all of their tips as required under the statute. See, e.g., 29 U.S.C. § 203(m) ("[A]ll tips received by such employee [must be] retained by the employee.").

Employee expenses may invalidate the tip credit if those expenses reduce employee compensation below the minimum wage. *See, e.g.*, *Pedigo v. Austin Rumba, Inc.*, 722 F. Supp. 2d 714, 721 (W.D. Tex. 2010) (finding employer took improper uniform deductions from the

paychecks of its servers, which effectively reduced servers' and bartenders' wages below the minimum wage). At trial, Plaintiffs testified that Defendants provided Plaintiffs with aprons, name tags, and server books. Plaintiffs further testified that Defendants never deducted the cost of any uniform shirts, nonslip shoes, or dark pants from Plaintiffs' paychecks. If Plaintiffs desired to buy extra shirts or server books, they could do so out of pocket. Despite Plaintiffs testimony that they made these purchases, Bishop purchased only one extra server book and Pender attested to buying a couple additional shirts over the years. This evidence is not sufficient to indicate that such expenses dropped Plaintiffs below the minimum wage. Additionally, Plaintiffs presented no evidence that employees had to pay for a walkout, a shortage, a mistaken order, or breakage. Therefore, Plaintiffs are not entitled to judgment against Defendants for inappropriate business expenses.

### D. Individual Defendants

Under the FLSA, an "employer" is defined as "any person acting directly or indirectly in the interest of an employer in relation to an employee . . ." 29 U.S.C. § 203(d). The Sixth Circuit has recognized that the statute "contemplates there being several simultaneous employers who may be responsible for compliance with the FLSA." *Dole v. Elliott Travel & Tours, Inc.*, 942 F.2d 962, 965 (6th Cir. 1991). In addition, "[t]he remedial purposes of the FLSA require the courts to define 'employer' more broadly than the term would be interpreted in traditional common law applications." *Dole*, 942 F.2d at 965 (internal quotation marks and citation omitted). More specifically, "[i]n deciding whether a party is an employer, 'economic reality' controls rather than common law concepts of agency." *Id.* at 965 (citation omitted).

Importantly, a "corporate officer who has operational control of the corporation's covered enterprise is an 'employer' under FLSA, along with the corporation itself." *U.S. Dep't of Lab. v.*

*Cole Enters.*, Inc., 62 F.3d 775, 778 (6th Cir. 1995). An employer may be "[o]ne who is the chief executive officer of a corporation, has a significant ownership interest in it, controls significant functions of the business, and determines salaries and makes hiring decisions . . . ." *Id.* It is also well-established that "[w]hether a party is an employer within the meaning of the FLSA is a legal determination." *Dole*, 942 F.2d at 965. The *Crowell* court concluded:

> [i]n short, "[a] person exercises operational control over employees if his or her role within the company, and the decisions it entails, directly affect the nature or conditions of the employees' employment." This "does not mean that the individual 'employer' must be responsible for managing plaintiff employees—or, indeed, that he or she must have directly come into contact with the plaintiffs, their workplaces, or their schedules." However, "the relationship between the individual's operational function and the plaintiffs' employment must be closer in degree than simple but-for causation."

Crowell, 670 F. Supp. 3d at 578 (cleaned up).

In *Dole v. Elliott Travel & Tours, Inc.*, the Sixth Circuit, using the economic realities test, reasoned that the defendant was an employer under the FLSA where the defendant delegated some responsibilities such as bookkeeping, tracking overtime, and day-to-day problems to managerial staff, yet still acted as the chief corporate officer and determined employee salaries. *Id.* at 966. The Sixth Circuit opined that it was not required that defendant had exclusive control of the day-to-day functions of the corporation, but rather it was sufficient that the evidence revealed the defendant "controlled the purse strings of the operation" and was the was the "top man" at the corporation which functioned for his profit. *Id.*

*Herman v. RSR Sec. Services Ltd.*, is also instructive. There, the trial court applied the economic realities test and evaluated whether the defendant: "(1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records." *Herman v. RSR Sec. Servs. Ltd.*, 172 F.3d 132, 139 (2d Cir. 1999) (internal quotation

marks and citations omitted). The court reasoned that because the defendant hired managerial staff who oversaw the plaintiffs, there was a strong indicator of control. *Id.* at 140. Further, on occasion, defendant controlled the employee schedules. As to determining rates and methods of payment, the defendant did not determine the rate of payment but signed paychecks. Finally, the defendant did not maintain employment records which the trial court noted was not dispositive. Thus, the trial court deemed the defendant an employer under the FLSA. The Second Circuit later upheld the trial court's determination noting that the totality of the circumstances was relevant in determining defendant's operational control over the corporation. *Id.* at 141.

Here, this Court finds that Plaintiffs have failed to demonstrate that Green and Lloyd are employers under the FLSA. First, while Green and Lloyd were never involved in the hiring or firing of employees, they were both involved in the promoting of Chris Beltran to the regional manager position. Green was also involved in the promotion of general manager, Ben Omaits. This factor militates towards a finding of operational control given that Beltran and Omaits had direct control over the servers and bartenders. *Id.* at 140; *Donovan v. Grim Hotel Co.,* 747 F.2d 966, 972 (5th Cir.1984) (finding operational control where the defendant "personally selected the manager of every hotel."). Second, unlike the defendants in *Dole* and *Herman*, Green and Lloyd did not set employee salaries or sign their paychecks. Further, there is no evidence that Green and Lloyd influenced the employee work schedules or maintained work schedules.

In sum, despite Green and Lloyd demonstrating operational control over general and regional managers, there is no indication that the individual defendants "held the purse strings," set employee compensation, engaged in employee training, or set up employment policies for the restaurants. *See, e.g.*, *Miller v. Food Concepts Int'l, LP*, 2017 WL 1163850, at *28 (S.D. Ohio Mar. 29, 2017) (finding the individual defendants not employers under the FLSA and reasoning that

"[p]laintiffs' economic dependence is on Abuelo's, not on DelVecchio or Myers. In other words, no money comes out of the pockets of DelVecchio or Myers to pay Plaintiffs. The terms and conditions of Plaintiffs' work are laid out in the employee handbook, which is not alterable by DelVecchio or Myers. … [Further,] DelVecchio, but not Myers, has the authority to hire or fire Plaintiffs. Finally, neither DelVecchio nor Myers establishes the rate and method of paying Plaintiffs, though they may maintain Plaintiffs' employment records."); *Cf. Donovan,* 747 F.2d at 972 (finding defendant was an employer under the FLSA where he traveled to inspect hotels, solved major problems, and selected all managers); *Crowell*, 670 F. Supp. 3d at 579 (defendant was an employer under the FLSA where plaintiffs indirectly reported to him through senior management,  he set compensation, and trained front of the house employees); *Benion v. LeCom, Inc.*, 336 F. Supp. 3d 829, 856 (E.D. Mich. 2018) (individual defendant was an employer under the FLSA where defendant held weekly meetings with management to discuss performance of employees, and was solely responsible for hiring, firing, compensation, and coordinating subcontractors). Accordingly, Plaintiffs have failed to establish that Lloyd and Green individually are employers under the FLSA as a matter of law.

### E.  Willfulness

Under the FLSA, the statute of limitations for a violation is two years. 29 U.S.C. § 255(a).  If Plaintiffs demonstrate a willful violation of FLSA occurred, however, the statute of limitations is extended to three years. *Id.*; *Hendricks v. Total Quality Logistics, LLC*, 694 F. Supp. 3d 1005, 1036 (S.D. Ohio 2023). To prove a willful violation, plaintiffs bear the burden to "demonstrate 'that the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute.'" *Id.* (citing *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 129 (1988)). "This standard requires more than a showing of negligence on the employer's part. …

28

Even if an employer acts unreasonably, but not recklessly, in determining its legal obligation under the FLSA, its conduct does not satisfy the 'willfulness' standard." *Schneider v. City of Springfield*, 102 F. Supp. 2d 827, 836 (S.D. Ohio 1999). The Sixth Circuit has found that an employer acted willfully where he "had actual notice of the requirements of the FLSA by virtue of earlier violations, [made an] agreement to pay unpaid overtime wages, and [assured] future compliance with the FLSA." *Dole*, 942 F.2d at 967.

In *Crowell*, for example, the court found that the employer was not entitled to summary judgment on the issue of willfulness where the employer had been named in a prior lawsuit which put the employer on notice of specific potential violations of the FLSA. *Crowell*, 670 F. Supp. 3d at 602. Similarly in *Hendricks v. Total Quality Logistics, LLC*, the employer had knowledge of a similar lawsuit against its competitor and had been subject to two investigations conducted by the Wage and Hour Division of the U.S. Department of Labor regarding the alleged FLSA violations which the court reasoned put the employer on notice. 694 F. Supp. 3d at 1037–1038. Notably, the court found no willful violation for that specific lawsuit only, given the investigations and other lawsuits were initiated after the initiation of that lawsuit. *Id.* at 1038.

Here, Plaintiffs have not adduced evidence of prior investigations or lawsuits that would have put defendants on notice of potential FLSA violations. Instead, Plaintiffs contend Defendants acted willfully because: (1) Defendants failed to ensure Plaintiffs were paid minimum wage for non-tipped work; and (2) Defendants' handbook confirms they knew about but ignored the tip credit notice requirement. This Court disagrees. The evidence presented at trial demonstrates that Defendants had taken various steps towards compliance with the tip credit notice requirement. Defendants posted posters, indicated in the handbook that employees were to receive a written notice regarding the tip credit, and managers were to discuss the tip credit orally with new

employees. Despite such, these policies were not enforced consistently, and this Court finds that Defendants failed to comply with the FLSA notice requirement. Even given this finding, however, the failure of Defendants to ensure managers were actually providing tip credit notice via written notice or orally communicating this to new employees is more akin to negligence. Most damaging to Plaintiffs' assertion of willfulness is that the evidence presented by Plaintiffs is not similar to the type of evidence present in prior cases where willfulness has been found. *See Stultz v. J.B. Hunt Transp., Inc.*, 35 F. Supp. 3d 866, 879 (E.D. Mich. 2014) (collecting cases finding willfulness where employers had notice via prior investigations and violations). Therefore, there is inadequate evidence of willfulness here and the statute of limitations is limited to two years under both the FLSA and Ohio law.[3]

## F. Good Faith

"The FLSA provides that liquidated damages be awarded for FLSA violations in an amount equal to the actual damages, 29 U.S.C. § 216(b), but a court may in its discretion refuse to award these liquidated damages 'if the employer demonstrates good faith and reasonable grounds for believing it was not in violation.'" *Hendricks*, 694 F. Supp. 3d at 1038. The employer's burden is substantial and requires a showing that it took "affirmative steps to ascertain the Act's requirements, but nonetheless violated its provisions." *Id.* (quoting *Martin v. Indiana Michigan Power Co.*, 381 F.3d 574, 584 (6th Cir. 2004)). Further, willfulness and good faith are two different standards, and a finding that an employer did not act willfully does does not bar a finding that the employer did not act in good faith. *Id.*

---

[3] "Unlike the FLSA, Ohio law does not provide for an extension of this statutory period in the case of a willful violation by the employer." *Viciedo v. New Horizons Computer Learning Ctr. of Columbus, Ltd.*, 246 F. Supp. 2d 886, 905 (S.D. Ohio 2003).

Defendants contend that they acted in good faith given that the evidence adduced at trial indicated they adopted procedures and policies to comply with the FLSA. Despite this Court's reasoning that the policies Defendants implemented rendered their non-compliance more akin to negligence than to willful violations of the FLSA, such is not sufficient to prove good faith. *Elwell v. Univ. Hosps. Home Care Servs.*, 276 F.3d 832, 841 n.5 (6th Cir. 2002) ("[A]n employer who acted negligently—but not willfully—in violating the FLSA would not be able to satisfy the objective standard of reasonableness required to demonstrate good faith."); *Solis v. Min Fang Yang*, 345 F. App'x at 39 ("[D]emonstrating good faith requires more than the absence of intent or knowledge."). Defendants produced no evidence that store management regularly followed up on their notice policies or ensured employees were able to clock in to the meeting code consistently when performing side work. Despite the company handbook provision stating a written policy statement would be provided, Chris Beltran testified that he knew no such written statement existed until after this lawsuit. Accordingly, Defendants should have taken affirmative steps to ensure that the notice was being communicated orally and that the meeting codes were being utilized properly, however, the evidence presented by Defendants at trial does not indicate this happened in reality. This lack of evidence demonstrates that the Defendants did not have objectively reasonable grounds for believing they were not violating the FLSA, and that Defendants did not act in good faith. Thus, pursuant to 29 U.S.C. § 216(b), Plaintiffs are to be awarded liquidated damages under the FLSA.

### G. Damages

"Any employer who violates section 203(m)(2)(B) of this title shall be liable to the employee or employees affected in the amount of the sum of any tip credit taken by the employer and all such tips unlawfully kept by the employer, and in an additional equal amount

as liquidated damages." 29 U.S.C. § 216(b). Plaintiffs are additionally entitled to reasonable attorneys' fees and costs. *Id.* As established above, Defendants have failed to prove its affirmative defense that it complied with the requirements for taking a tip credit and that they acted in good faith. Additionally, because Defendants failed to meet their burden of maintaining records, Plaintiffs need not prove exact damages but rather are entitled to a speculative damages award based on reasonable inference. *See supra* Section III.B. (citing *Rafferty*, 13 F.4th 1166). Thus, Plaintiffs are entitled to the sum of any tip credit taken by the employer and liquidated damages in an amount equal to his or her unpaid minimum wages. *See Neuhoff v. Hosp. Goals LLC*, 2025 WL 918811, at *3 (N.D. Ohio Mar. 26, 2025). Under Ohio law, however, an employee is entitled to treble damages in an amount "two times the amount of back wages." *Scarbrough v. Motivated & Empowered, Inc.*, 2022 WL 896672, at *3 (N.D. Ohio Mar. 28, 2022) (citing Ohio Rev. Code § 4111.14(J); Ohio Const., Art II. § 34a.).[4]

Accordingly, Plaintiffs are entitled to recover the amount of the tip credit taken for each hour they worked, plus all misappropriated tips and unlawful deductions, plus an equal amount as liquidated damages for the West Virginia Plaintiffs and two times that amount for the Ohio Plaintiffs. See 29 U.S.C. § 216(b); Ohio Rev. Code §§ 4111.02, 4111.03, 4111.10, 4111.14(J).

## IV.  CONCLUSION

The Corporate Defendants are liable to Plaintiffs under the FLSA and the Ohio Minimum Wage Fair Standards Act; Plaintiffs are entitled to an award of liquidated damages; and Plaintiffs'

---

[4] "Although liability under the FLSA and Ohio law use the same standards to determine liability, the laws provide different measures of liquidated damages. The FLSA provides that an employee is entitled to liquidated damages in an amount equal to his or her unpaid minimum wages absent the defendant showing that the unlawful act or omission was reasonable or in good faith. 29 U.S.C. §§ 216(b) & 260. In contrast, Ohio law provides than an employee is entitled to liquidated damages in an amount "two times the amount of back wages." *Scarbrough*, 2022 WL 896672, at *3.

claims are subject to a two-year statute of limitations period under both the FLSA and the Ohio Minimum Wage Fair Standards Act. There is no individual liability on behalf of Stephon Green or Scott Lloyd. Plaintiffs are hereby **AWARDED** the following:

(1) $65,719.49 in unpaid minimum wages for the West Virginia Plaintiffs;

(2) $65,719.49 in liquidated damages for the West Virginia Plaintiffs;

(3) $54,521.13 in unpaid minimum wages for the Ohio Plaintiffs;

(4) $109,042.26 in treble damages for the Ohio Plaintiffs.

Any request for attorney fees may be brought in a motion pursuant to Fed. R. Civ. P. 54(d)(2). Such motion is to be filed within thirty (30) days of this Order. Defendants may file Memorandum Contra within fourteen (14) days of Plaintiffs' Motion, and Plaintiffs may file their Reply within seven (7) days of receipt of Defendants' Memoranda Contra.

**IT IS SO ORDERED**.

_____
**ALGENON L. MARBLEY**
**UNITED STATES DISTRICT JUDGE**

**DATED:  June 5, 2026**